DOME REALTY, INC., FARGO REALTY, INC., GRAY REALTY, INC., ZOOM REALTY, INC., KEEN REALTY, INC., STONE REALTY, INC., MEYER LOBSENZ AND THEODORE A. LOBSENZ, PLAINTIFFS-APPELLANTS, v. CITY OF PATERSON, A MUNICIPAL CORPORATION OF NEW JERSEY, AND THE PATERSON DIVISION OF COMMUNITY IMPROVEMENTS, DEFENDANTS-RESPONDENTS.

Argued February 5, 1980—Decided June 17, 1980.

216

*Theodore A. Lobsenz* argued the cause for appellants (*Meyer Lobsenz*, attorney).

*Henry Ramer*, Corporation Counsel, argued the cause for respondents.

The opinion of the Court was delivered by

PASHMAN, J.

This case and two others decided today [1] concern the means by which local governments may attempt to solve the problems of deteriorating urban housing—problems one court has called "almost insoluble." See *Samuelson v. Quinones*, 119 *N.J.Super.* 338, 343, 291 *A.2d* 580 (App.Div.1972). In the present appeal we consider whether a municipality may require substantial compliance with the standards of habitability contained in its housing

---

[1] *State v. CIB International*, 83 *N.J.* 262 (1980), and *Orange Taxpayers Council, Inc. v. City of Orange*, 83 *N.J.* 246 (1980).

code before a new tenant may take possession of rented residential premises.[2]

On February 10, 1978, the City of Paterson enacted "An Ordinance Requiring a Certificate of Occupancy for Re-Rental of Dwelling Units." In its "Statement of Policy" the ordinance declared that "existing programs have not kept pace with the need for [housing] code enforcement" and that "an appropriate opportunity to intervene in the downward cycle of housing deterioration is presented on the re-renting of a housing space * * *." The city accordingly invoked its police power—"in order to protect the health, safety and welfare of the citizens of the City of Paterson"—to prohibit landlords from allowing a new tenant to occupy a dwelling until the city issued a new "certificate of occupancy" for the premises.

The ordinance applied to all rented residential dwellings except two-family structures where one of the dwellings was occupied by the owner. Under the ordinance the landlord of an affected dwelling was required to obtain a "Certificate of Occupancy" from the city's Division of Community Improvements, Department of Community Development, "immediately prior to allowing a new tenant to take possession of a housing space."[3]

Upon a landlord's application, the city department would only grant a certificate after an inspection of the dwelling to determine its compliance with the building, plumbing, electrical and fire codes of the City of Paterson. A violation of any of the codes would be cause for withholding a certificate. However, the ordinance provided for issuance of a temporary certificate if the inspection revealed only "minor violations * * * which * * * may be corrected within thirty (30) days with tenants

---

[2] The validity of such a local regulatory scheme was a question specifically reserved by this Court in *Dresner v. Carrara*, 69 *N.J.* 237, 243 (1976).

[3] As originally enacted in February, the ordinance did not define "immediately prior."

in occupancy * * *." "Minor violation" was defined as any departure from housing code standards having "no or insignificant impact on the health, safety or welfare of the occupants" of the dwelling. If an inspector found that minor violations still existed at the end of the 30-day period, the temporary certificate would be revoked.

The ordinance required that the city conduct an inspection within three business days after a request by the landlord. If an inspection was not performed within such time, the landlord could consider himself the recipient of a temporary certificate until the inspection had been completed.

Under the ordinance an inspection before re-renting was unnecessary when the entire building in which the "housing space" was located had been inspected within the preceding 12 months. If the entire building had received a certificate of occupancy after such a general inspection, a certificate for an individual apartment would issue automatically. Inspections of entire buildings were subject to the same time limitations on municipal action—three business days—as inspections of individual dwellings. The city would also issue a temporary certificate for a building if inspectors found violations that could be eliminated within 30 days.[4]

The original version of the ordinance contained a schedule of fees for the issuance of the various types of certificates.[5] It also required the landlord to distribute to all tenants copies of the pertinent certificates supplied by the city. Violations of any provision of the ordinance were punishable by a fine of not more than $500, imprisonment of not more than 90 days, or both.

---

[4]Where the inspection covered an entire building, there was no requirement that violations be "minor" for a temporary certificate to issue.

[5]The fee for a full certificate was $10; temporary certificates cost $5. The charge for certificates covering an entire building equalled the single dwelling rate multiplied by the number of rental dwellings. The ordinance permitted a landlord to charge a new tenant for $5 of the inspection fee.

Plaintiffs [6] commenced this action on February 23, 1978, by filing a complaint in lieu of prerogative writs, *R.* 4:69, in the Superior Court, Law Division. They claimed that the ordinance as originally enacted in February was unconstitutional for several reasons. They asserted that the ordinance was confiscatory, that it deprived them of the use of their property without due process and without compensation, that the standards of the ordinance were impermissibly vague, and that the exemption of owner-occupied dwellings deprived plaintiffs of the equal protection of the laws. Among the other alleged grounds of invalidity were that State legislation had preempted municipal regulation, that prohibiting occupancy without the issuance of a certificate constituted a penalty exceeding the limit permitted for municipal ordinances, and that the ordinance illegally prohibited landlords from passing on the costs of inspections to their tenants.

On April 4, 1978, while the plaintiffs' complaint was pending, the City of Paterson amended the ordinance. This amendment required that an individual dwelling unit be inspected while vacant. It further provided that an inspection would not be considered "immediately prior" unless it occurred no more than ten days before the new tenant's occupancy. The amendment also eliminated from the ordinance all provisions for advance inspections of entire buildings.

The April amendment established an expedited inspection procedure. It was available if a tenant needed to move in before the expiration of the normal period of three business days and if the landlord had not delayed in making a request for an immediate inspection. Given those circumstances, the city would perform an inspection by the end of the next business day following the request.

---

[6]Dome Realty, Inc., Fargo Realty, Inc., Gray Realty, Inc., Zoom Realty, Inc., Keen Realty, Inc., Stone Realty, Inc., Meyer Lobsenz and Theodore A. Lobsenz. The last plaintiff was an officer of each of the corporate plaintiffs. All the plaintiffs own and operate rental dwellings in Paterson.

Under the amended ordinance, the city would mail or make available the results of an inspection on the same day the Division of Community Improvements determined them. Any aggrieved person could appeal a denial of a certificate in writing to the Director of the Department of Community Development. The director would "hear the appeal, render a decision thereon and file his decision with a statement of the reasons therefor with the Division not later than 5 business days following the submission of the appeal." A failure to respond to an appeal within five business days would be deemed a denial for purposes of further judicial review.

The amendment substituted a new fee schedule,[7] and required that the fees accompany applications for inspection. It also provided that a landlord could impose the costs of an inspection upon a tenant if his failure to take possession when agreed made a second, "immediately prior" inspection necessary.

After the city enacted the April amendment, plaintiffs amended their complaint to challenge the amended ordinance as well as the original version. The trial court then heard arguments on cross-motions for summary judgment.

In an oral opinion delivered on April 24, 1978, the trial court generally upheld the ordinance in its amended form as a valid exercise of municipal police power.[8] The court declared two provisions invalid: the requirement that an inspection occur

---

[7]The number of housing spaces included in a landlord's request determined the amount of the inspection fee:

| | Inspection | Reinspection |
| --- | --- | --- |
| First Housing Space | $10.00 | $5.00 |
| Second Housing Space | 8.00 | 4.00 |
| Third and each additional Housing Space | 6.00 | 4.00 |

[8]Plaintiffs continued their attack upon the original February ordinance because of their claim that the fees exacted under it were illegal. The trial court originally refused to consider the earlier impositions and accordingly dismissed without prejudice the challenge to the original ordinance. Upon the Appellate Division's remand, however, the trial court apparently held that the question whether the city could charge inspection fees necessitated an inquiry into the validity of the previous versions of the enactment.

within ten days before a new tenant takes possession, and the qualification that only a temporary certificate would be granted by reason of the city's failure to inspect promptly. The court held that the ten-day limitation unfairly imposed upon landlords the consequences of the city's failure to prevent vandalism in unoccupied rental dwellings. By excising references to temporary certificates, the court reformed the ordinance to grant landlords a permanent certificate by operation of law if the city did not complete an inspection within three business days. The court's rationale was that landlords should not be penalized with merely provisional permission to rent because of deficiencies in the city's housing inspection procedures.

Plaintiffs appealed to the Appellate Division on June 13, 1978. On July 18, 1978, while that appeal was pending, the City of Paterson again amended the ordinance. This second set of amendments lengthened the period during which the landlord must obtain an inspection from ten days to thirty days before occupancy. It re-defined "minor violation" as "a departure from the City's Basic Housing Property Maintenance Code [9] which still leaves the housing space in substantial compliance with such Code" (footnote added). The July amendment also provided that the temporary discontinuance during vacancy of electricity, gas or water service would not be grounds for denying a certificate.

In an unreported opinion, the Appellate Division vacated the judgment of the trial court and remanded. In view of the "issues of significant policy considerations" and the potential impact of even partial invalidation of the ordinance, the court held that summary judgment had been inappropriate. Retaining jurisdiction, the Appellate Division directed the trial court to hold a plenary hearing on the reasonableness of the ordinance and its enforcement. It also ruled that the trial court should

---

[9]The Basic Housing Property Maintenance Code was a compilation of the various sets of regulations which had governed housing conditions in Paterson. The July amendment caused the ordinance to refer to this codification instead of the former housing codes.

make its findings in the light of the most recent amendments to the ordinance in July 1978.

After two days of hearings, the trial court rendered written findings of fact and conclusions of law. The court made the following pertinent findings regarding general housing conditions in Paterson:

1. In 1977 approximately 70 percent of the housing units in the City of Paterson were renter-occupied, and approximately 70 percent of the renter-occupied housing units were in structures over forty years of age.

2. In 1977 approximately one-quarter of the housing units in the City of Paterson were located in structures that were classified as substandard, and one-quarter of these structures were so deteriorated and in such state of disrepair as to necessitate demolition.

3. That as of February 1977 there existed 237 abandoned and vacant residential structures containing 686 housing units.

4. That approximately 25,000 or one-half the total housing units in Paterson in 1977 were in violation of the applicable municipal housing codes, and were in need of varying types of and varying degrees of repair, but that all of such units were in structures which represent good potential for rehabilitation.

 \* \* \* \* \* \* \* \*

6. That the Bureau of Housing Inspection of the State of New Jersey and the Division of Community Improvements of the City of Paterson have not been able with past and present enforcement laws to either maintain or upgrade the housing stock in the city, but rather said housing stock has and continues to deteriorate at an alarming rate.

7. That there is a strong need to insure proper maintenance and upgrading of those structures rated as Condition "B" or "C" [in need of rehabilitation] to prevent their progressive decline to a more severe substandard condition.

8. That considering the extremely low renter vacancy rate, there is also a strong need to insure proper maintenance and upgrading, if possible, of those structures presently rated Condition "D" [not feasible for rehabilitation] until such time as alternate housing can be provided by redevelopment or other means.

9. That the City of Paterson is in need of additional enforcement tools to insure that its inhabitants are afforded acceptable and adequate housing and to protect such inhabitants from housing conditions which would be detrimental to their health, safety and welfare.

[footnote omitted]

The trial court found that the ordinance was a reasonable response to the problems presented by Paterson's deteriorating stock of rental housing. Based on a full factual investigation, the court found that the prior versions of the ordinance were valid as written. Accordingly, the trial court upheld the imposition of inspection fees paid under their authority and concluded

that plaintiffs' complaint should be dismissed. The matter then returned to the Appellate Division, which substantially adopted the trial court's findings and ordered dismissal of the complaint.[10]

Plaintiffs petitioned this Court for certification, which we granted, 81 *N.J.* 345 (1979), limited to the issue of the validity of the Paterson ordinances. We affirm. Our discussion first addresses whether the Legislature has authorized the type of municipal initiative embodied in the ordinance. We then examine each of plaintiffs' several claims that specific portions of the ordinance are unconstitutional or otherwise invalid.

I

As a general principle, it is established beyond question that municipalities, being created by the State, have no powers save those delegated to them by the Legislature and the State Constitution. *E. g., Ringlieb v. Parsippany-Troy Hills Tp.*, 59 *N.J.* 348 (1971); *Moyant v. Borough of Paramus*, 30 *N.J.* 528 (1959). This Court has established a three-part analysis for determining the propriety of an exercise of legislative authority by a municipality. See *Inganamort v. Borough of Fort Lee*, 62 *N.J.* 521, 527 (1973). Under this approach the first question is whether the State Constitution prohibits delegation of municipal power on a particular subject because of the need for uniformity of regulation throughout the State. *Id.* Such matters as the principles of the construction and enforcement of contracts, the rules of intestate distribution and the definitions of crimes should not depend for their content on local conditions. In such areas the State Legislature may not delegate authority to local governments. See *N.J.Const.* (1947), Art. IV, § 1, par. 1; Art. VI, § 1, par. 1; *N.J. Builder's Ass'n v. East Brunswick Tp.*, 60 *N.J.* 222, 227 (1972); *Wagner v. Newark*, 24 *N.J.* 467, 478 (1957).

---

[10]The second opinion of the Appellate Division stated that the court was affirming "the judgment dismissing the complaint." We note that the formal entry of judgment by the trial court would have been improper since the Appellate Division had retained jurisdiction of the matter.

If the Legislature may delegate authority in the area under scrutiny, the second question is whether the Legislature has in fact done so. *Inganamort,* 62 *N.J.* at 527. The third part of the analysis reflects the Legislature's prerogative to divest delegated authority from a municipality. This final issue is thus whether any delegation of power to municipalities has been preempted by other State statutes dealing with the same subject matter. *Id.*

We now direct each of the three inquiries towards the Paterson ordinance.

## A

■ Local housing conditions, the subject of the Paterson ordinance, present community needs that are ideally suited for local intervention. The State Constitution expressly permits the Legislature to delegate to municipalities the responsibility for regulating local land use by means of zoning schemes. *N.J. Const.* (1947), Art. IV, § 6, par. 2. Those matters that bear a close relation to the subject matter of local zoning ordinances— the conditions and use of land and its improvements, see *id.; N.J.S.A.* 40:55D–62—are equally appropriate for local treatment.

■ The fact that deteriorating housing conditions may be endemic throughout the urban areas of New Jersey does not foreclose local initiative.

A problem may exist in some municipalities and be trivial or nonexistent in others. And if the evil is of statewide concern, still practical considerations may warrant different or more detailed local treatment to meet varying conditions or to achieve the ultimate goal more effectively. [*Inganamort,* 62 *N.J.* at 528]

The presence of "[v]arying conditions, including, for example, the existence or lack of sufficient housing," *N.J. Builder's Ass'n v. East Brunswick Tp.,* 60 *N.J.* at 227, clearly allows diversity of treatment.

■ This potential diversity does not present a constitutional obstacle to local home rule. It rather highlights the virtue of permitting local solutions to the varying public problems which confront municipalities.

[Where t]here is no inevitable need for a single statewide solution or for a single statewide enforcing authority * * * it may be useful to permit municipalities to act, for, being nearer the scene, they are more likely to detect the practice and may be better situated to devise an approach to their special problems. Then, too, municipalities may provide enforcement personnel the State has not supplied in adequate numbers and hence be able to nip an offensive movement with which a State agency could not deal until after the event. [*Summer v. Teaneck*, 53 *N.J.* 548, 553 (1969)]

■ Enforcement of local housing standards is a particularly apt matter for local determination. We take judicial notice that the conditions of Paterson's housing stock, as found by the trial court, stand in stark contrast to conditions existing in more affluent and less urban parts of the State. Roughly one-half of Paterson's housing contained violations of the city's housing codes which could feasibly be remedied. "There is no inevitable need for a single statewide solution," *id.*; indeed, the trial court found that the uniformity of treatment afforded by statewide enforcement had been an ineffective solution. The Legislature, therefore, would not be abdicating its constitutional responsibilities by delegating to Paterson and the other 566 municipalities of this State the authority to create individually tailored schemes for enforcing minimum standards of habitability in rental housing. We conclude that the enforcement of local housing codes is a matter that is constitutionally appropriate for local initiative.

■ Having found that the Legislature may delegate authority for the enforcement of local housing codes, we next consider whether the Legislature has in fact done so.

### B

■ After oral argument in this matter, the Legislature resolved beyond question whether municipalities have the authority to require substantial compliance with local housing codes before a new tenant may take possession of a residential dwelling. Chapter 476 of the Laws of 1979, *N.J.S.A.* 40:48–2.12m, effective February 27, 1980, provides as follows:

The governing body of a municipality may adopt ordinances regulating the maintenance and condition of any unit of dwelling space, upon the termination of occupancy, in any residential rental property for the purpose of the safety,

healthfulness, and upkeep of the structure and the adherence to such other standards of maintenance and condition as are required in the interest of public safety, health and welfare. Such ordinances shall require the owner of any residential rental property, prior to rental or lease involving a new occupancy of any unit of dwelling space in such property, to obtain a certificate of inspection or occupancy for the unit of dwelling space. Such certificate of inspection or occupancy shall be issued by the municipality upon the inspection of the unit of dwelling space by a municipal inspector and his findings that such unit meets the standards provided by law. The municipality may charge a fee to fund the costs of the inspections and the issuance of the certificates. For purposes of this act "owner" means the person who owns, purports to own, or exercises control of any residential rental property.

In unmistakable terms, this new enactment grants to municipalities the power to prohibit new rentals of residential dwellings except where an official inspection determines that the unit meets existing standards of safety and habitability. There can therefore be no doubt that as of February 27, 1980, the effective date of the legislation, see *L.*1979, *c.* 476, § 2, the City of Paterson could enforce its housing code by means of an inspection and certification scheme that governed new rentals of residential dwellings.

■ The Assembly Statement which accompanied the legislation during the enactment process noted:

A number of municipalities presently have such ordinances [as are authorized by the statute] and the public has benefited from them. However, some recent court decisions have created some confusion as to whether municipalities have the authority for such ordinances. [*Statement Accompanying Assembly No. 3461* (1979)]

We discern in this statement a strong intention that existing inspection and certification schemes be ratified as valid exercises of municipal authority. This would be the most effective means of insuring that previously enacted ordinances would continue to benefit the public without interruption. While as a general rule statutes will not be interpreted to apply retroactively, it is clear that in this case the manifest intent of the Legislature cannot otherwise be satisfied. See *Skulski v. Nolan,* 68 *N.J.* 179, 202 (1975); *Rothman v. Rothman,* 65 *N.J.* 219, 224 (1974); see also *City of Plainfield v. Pub. Serv. Elec. & Gas Co.,* 82 *N.J.* 245 (1980). We need go no further to conclude that the Paterson ordinance is presently a valid exercise of local legislative power.

If plaintiffs sought only a declaration that the ordinance was beyond the scope of delegated municipal authority, our inquiry would be at an end. However, they also seek a determination that Paterson must return to them all inspection fees collected prior to the commencement of their suit. The Legislature's ratification of the ordinance would not save earlier monetary impositions from illegality if they were unauthorized when paid. We therefore find it necessary to consider whether a basis for municipal authority exists independently of the new statute.

One source of municipal power to regulate the condition of housing is *N.J.S.A.* 40:48–2.12a, which provides

> The governing body of any municipality may make, amend, repeal and enforce ordinances to regulate buildings and structures and their use and occupation to prevent and abate conditions therein harmful to the health and safety of the occupants of said buildings and structures and the general public in the municipality.

The Legislature enacted this provision as part of "An Act concerning municipalities in relation to the regulation of buildings and structures and their use and occupancy, and supplementing Title 40 of the Revised Statutes," *L.*1962, *c.* 66, *N.J.S.A.* 40:48–2.12a to –2.12*l*. The act contained various sections authorizing municipal registration of rental dwellings, *N.J.S.A.* 40:48–2.12c, abatement of defective conditions by municipal expenditures, *N.J.S.A.* 40:48–2.12f, and the appointment of custodians or receivers to supervise proper maintenance of rental dwellings, *N.J.S.A.* 40:48–2.12g to –2.12k. All of these provisions, however, were made optional at the discretion of the governing body of the municipality.[11]

The general grant of enforcement authority in *N.J.S.A.* 40:48–2.12a does not restrict its scope to the several individual authorizations contained in later provisions of the act. This section would be devoid of independent significance if we construed it as a mere summary of specific authorizations. *Cf. In*

---

[11]Each section authorizing a particular mode of enforcement begins by stating, "Any ordinance adopted pursuant to this act *may* provide * * *," *N.J.S.A.* 40:48–2.12c, –2.12d, –2.12e and –2.12*l* (emphasis added), or "*may* also provide * * *," *N.J.S.A.* 40:48–2.12f, –2.12g (emphasis added).

re *Toms River Water Co.,* 82 *N.J.* 201, 211 (1980); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 68 (1978). It therefore appears that the Legislature's delegation of authority "to prevent and abate [housing] conditions * * * harmful to the health and safety of the occupants" is sufficiently broad to encompass a scheme prohibiting the rental of housing that does not conform to minimum requirements for "health and safety."

 A second and independently adequate source of delegated power exists in the general municipal "police power" statute, *N.J.S.A.* 40:48–2:

> Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

This statute confers "an express grant of broad general police powers to municipalities * * * subject only to the limitation that such action not be prohibited by or inconsistent with the Constitution or the other statutes." *Fred v. Mayor of Old Tappan,* 10 *N.J.* 515, 520–521 (1952). See *Inganamort,* 62 *N.J.* at 536; *N.J. Builder's Ass'n,* 60 *N.J.* at 226; *Summer v. Teaneck, supra; Moyant v. Paramus, supra; Kennedy v. City of Newark,* 29 *N.J.* 178 (1959); *Adams Newark Theatre Co. v. City of Newark,* 22 *N.J.* 472 (1956), aff'd, 354 *U.S.* 931, 77 *S.Ct.* 1395, 1 *L.Ed.*2d 1533 (1957); see also *N.J.Const.* (1947), Art. IV, § 7, par. 11. Such a broad "reservoir of police power," *Inganamort,* 62 *N.J.* at 536, is alone sufficient to permit municipal regulation of minimum standards for rental housing—an area that vitally affects the "health, safety and welfare" of residential tenants, see *Trentacost v. Brussel,* 82 *N.J.* 214 (1980). We therefore conclude that when enacted, Paterson's ordinance was a valid exercise of authority delegated to it by the Legislature.

Plaintiffs contend that the use of certificates of occupancy in Paterson's enforcement scheme is without statutory authorization. They argue that under the State Uniform Construction Code Act, *N.J.S.A.* 52:27D–119 *et seq.,* the issuance of a certifi-

cate of occupancy is authorized only when construction or alteration of a building is completed or when the structure undergoes a change in use. See *N.J.S.A.* 52:27D–133.

We examined the function of certificates of occupancy in *Dresner v. Carrara*, 69 *N.J.* 237 (1976). At issue in that case was whether a municipal planning board could impose land use regulations on a non-conforming use upon a change in occupancy of the premises. *Id.* at 240. The issuance of a certificate of occupancy was the means by which the planning board confirmed a structure's status as a non-conforming use. See *id.* at 239, 243 n. 2. We held that there was no legislative authorization for the imposition of previously inapplicable requirements where there was no change in the use of the property. *Id.* at 241. We went on in *Dresner* to discuss generally the use of a certificate of occupancy in the zoning ordinance under scrutiny in that case. Such a certificate served to memorialize the existence of a non-conforming use. See *id.* at 243 n. 2. We did not pass upon the validity of this scheme, see *id.* at 243, but we did describe the conventional occasions for requiring an occupancy permit:

> (1) the completion of a building—the purpose being to confirm that it has been constructed in accordance with the building code, the building permit and any other applicable municipal regulation; (2) the alteration of a building—the purpose being the same as in (1) above; (3) the use of vacant and hitherto unused land—the purpose being to insure that the intended use conforms to the zoning ordinance and any other pertinent regulation; (4) any change of use—whether the land be improved or not—the purpose being as last stated. [*Id.* at 242 (citation omitted)]

We did not intend this list to be exclusive: "[t]here may be, or there may later develop, other occasions when such a certificate will serve a useful and valid end in land use control." *Id.* at 243. The case before us presents just such an occasion. We have found statutory authorization for the municipal regulations of conditions in rental housing. Paterson's ordinance uses a certificate of occupancy as a "tangible manifestation," see *id.* at 242, of a dwelling's substantial compliance with its housing regulations. In doing so, the ordinance does not rely upon the State Uniform Construction Code Act for authorization. The sources of municipal authority are *N.J.S.A.* 40:48–2.12a and the

"police power" statute, *N.J.S.A.* 40:48–2. The fact that the ordinance uses "certificates of occupancy" may lead to confusion in nomenclature, for Paterson presumably employs two types of official documents called "certificates of occupancy"—one under its ordinance and the other under the Uniform Construction Code Act. This duplication of terminology, however, does not serve to invalidate a legislative delegation by another, unrelated statute. We find no lack of authority for the city's use of a document which simply memorializes the result of a housing inspection.[12]

▪ In broad terms, the Legislature has empowered the City of Paterson to adopt an inspection and certification scheme for rental housing. Thus the ordinance satisfies the second of the three criteria for determining the validity of municipal authority. It remains for our consideration whether the State has preempted or barred the specific exercise of authority contained in the ordinance.

### C

▪ While a municipality may not legislate in an area which the State has preempted, the Legislature's intent to prevent local initiatives must appear clearly. "It is not enough that the Legislature has legislated upon the subject, for the question is whether the Legislature intended its action to preclude the exercise of the delegated police power." *Summer*, 53 *N.J.* at 554; see *Overlook Terrace Management Corp. v. Rent Control Bd. of West New York*, 71 *N.J.* 451, 461–462 (1976).

> The ultimate question is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act. [*Summer*, 53 *N.J.* at 555]

We find evidence not of legislative preemption or immobilization, but of legislative encouragement.

---

[12]The use of certificates of occupancy is now specifically authorized by *N.J.S.A.* 40:48–2.12m. See *supra* at 227–228.

The Hotel and Multiple Dwelling Law, *N.J.S.A.* 55:13A–1 *et seq.*, places responsibility at the level of State government for housing conditions in the Department of Community Affairs. See *N.J.S.A.* 55:13A–4, –5. Among that department's other responsibilities are to "[a]ssist local government in the solution of its problems, to strengthen local self-government" and to "[s]timulate local programs through publicity, education, guidance and technical assistance concerning Federal and State programs." *N.J.S.A.* 52:27D–9(d), (h). These are hardly consistent with the assertion that the State possesses exclusive authority in the field of housing. *Cf. Apartment House Council v. Ridgefield*, 123 *N.J.Super.* 87, 93 (Law Div. 1973), aff'd. 128 *N.J.Super.* 192 (App.Div.1974). More to the point is section 25(b) of the Hotel and Multiple Dwelling Law:

This act is not intended, and nothing in this act shall be construed, to preclude the right of any municipality to adopt and enforce ordinances or regulations more restrictive than this act or any rules or regulations promulgated thereunder. [*N.J.S.A.* 55:13A–25(b)]

No more explicit an expression that preemption has *not* occurred could be imagined. See *Boulevard Apartments v. Borough of Hasbrouck Heights*, 111 *N.J.Super.* 408 (Law Div.1970), certif. den., 57 *N.J.* 124 (1970). Municipalities may therefore establish remedial measures for violations of their own housing codes, so long as the content of the codes themselves is no less restrictive than State regulations.[13] See *id.*, 111 *N.J.Super.* at 416–417. We find no indication—much less· one that is clear—that the Legislature intended State regulation and enforcement of minimum standards of habitability to be exclusive.[14] We therefore find no preemption by the Legislature.

The foregoing analysis makes clear that the Paterson ordinance is a constitutionally appropriate subject for local initia-

---

[13]Plaintiffs do not contend that the substantive regulations enforced by the ordinance are preempted by the Hotel and Multiple Dwelling Law.

[14]For the reasons stated earlier in this opinion, *supra* at 230–232, we have concluded that the provision of the Uniform Construction Code Act regarding certificates of occupancy, *N.J.S.A.* 52:27D–133, does not conflict with the Paterson ordinance.

tive, that the Legislature had authorized such initiative even before it enacted *N.J.S.A.* 40:48–2.12m, and that it has never expressed a clear intention to prohibit the specific type of initiative embodied in the ordinance. We accordingly hold that the Paterson ordinance, as originally enacted and as amended, constituted a valid exercise of municipal legislative authority.

## II

Besides challenging the existence of any legislative delegation of authority to the City of Paterson, plaintiffs raise a number of claims directed to the substance of the ordinance: (1) that it is arbitrary and unreasonable to require inspection of an apartment only while it is vacant; (2) that the vacancy requirement deprives Paterson landlords of a just and reasonable return on their rental property; (3) that the standard of "substantial compliance" in the ordinance is impermissibly vague; (4) that the ordinance permits unconstitutional searches of apartments by municipal inspectors; [15] (5) that denying occupancy without a certificate amounts to a penalty in excess of the $500 limit established by *N.J.S.A.* 40:49–5; (6) that the exclusion of owner-occupied, two-family housing from the scope of the ordinance violates constitutional principles of equal protection; and (7) that depriving landlords of income before violations are found denies plaintiffs procedural due process.

These contentions are not addressed to the authority of the city to charge plaintiffs for inspection fees.[16] Since plaintiffs

---

[15]Plaintiffs advanced this argument for the first time in the Appellate Division after the trial court's hearing on remand. Generally the absence of a factual record regarding a constitutional issue strongly militates against review. See *Elizabeth Bd. of Ed. v. Elizabeth City Council,* 55 *N.J.* 501, 509–510 (1970). However, we find that this argument presents solely a legal issue which the Court can resolve without the benefit of an extensive record.

[16]Plaintiffs challenged both the imposition and amount of inspection fees at trial, but have since abandoned these claims, excepting the asserted absence of any municipal inspection authority whatsoever. We therefore find no reason to disturb the trial court's findings that the fees were within the city's delegated police powers and were reasonably related to the actual costs of

instead seek to invalidate the ordinance prospectively, we need only consider the latest version of the enactment, which incorporates both the April and July amendments, to resolve their allegations. See *Odabash v. Mayor and Council of Dumont*, 65 *N.J.* 115, 123 (1974); *Hohl v. Readington Tp.*, 37 *N.J.* 271, 279 (1962); see also *Kruvant v. Tp. of Cedar Grove*, 82 *N.J.* 435, 442 (1980). We address each of the plaintiff's claims in the order stated.

A

In determining whether a municipal ordinance is arbitrary or unreasonable, courts place a heavy burden on the proponents of invalidity.

> Municipalities have the power and authority to enact ordinances in support of the police power. Municipal ordinances, like statutes, carry a presumption of validity. The presumption is not an irrebuttable one, but it places a heavy burden on the party seeking to overturn the ordinance. Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body or which could reasonably be assumed to have been known which would rationally support a conclusion that the enactment is in the public interest. [*Hutton Pk. Gardens v. West Orange Town Council*, 68 *N.J.* 543, 564–565 (1975) (citations omitted)]

See, *e. g., Borough of Collingswood v. Ringgold*, 66 *N.J.* 350 (1975), app. dism. 426 *U.S.* 901, 90 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976); *Hudson County News Co. v. Sills*, 41 *N.J.* 220, 228 (1963), app. dism. 378 *U.S.* 583, 84 *S.Ct.* 1914, 12 *L.Ed.*2d 1056 (1964); *Moyant v. Borough of Paramus*, 30 *N.J.* at 534–535.

Plaintiffs have produced no evidence to meet their burden of proof that the vacancy requirement is irrational. To the contrary, there are numerous advantages to a requirement that inspections take place while an apartment is not occupied. According to testimony by city housing inspectors, inspections of vacant dwellings are more effective. Without furniture or other personal belongings of the tenant, it is much easier to

---

inspection. The new statute, *N.J.S.A.* 40:48–2.12m, expressly authorizes their imposition. See *supra* at 227.

examine and determine the structural condition of the apartment. Inspectors can also avoid the problems associated with uncooperative or absent tenants, thereby reducing the number of return trips and increasing the efficiency of enforcement efforts.

Conditioning occupancy upon an inspection encourages landlords to make apartments available to officials for inspection. If violations are found while an apartment is vacant, there is no necessity to evict the tenant to protect his health and safety. Certainly the requirement gives landlords great' incentive to remedy defective conditions once an inspection uncovers them, and to supervise their properties more carefully so that a new tenancy is not delayed by the presence of serious violations.

 The city thus achieves more effective and efficient enforcement of its housing code by requiring a dwelling to be vacant during an inspection. Plaintiffs' challenge that the requirement is arbitrary and unreasonable must therefore fail.

### B

 Plaintiffs allege that the financial burdens of the ordinance—the loss of rent due to vacancy until the city issues a certificate of occupancy—prevent them from earning a fair and reasonable profit on their properties. It therefore assertedly constitutes a confiscatory and unconstitutional form of regulation. Except for evidence in the record regarding vandalism of vacant dwellings in Paterson, their contention lacks any factual support.

> Plaintiffs in the present case have not tendered evidence as to their actual profits or losses, the value of their properties, the state of the housing market, or any of the other factors which a court would have to consider to determine whether the ordinances failed to permit a just and reasonable return. [*Hutton Pk. Gardens*, 68 *N.J.* at 571 (citation omitted)]

Without a detailed showing that the ordinance does in fact prevent a fair return, or a facial demonstration that it precludes "any possibility of a just and reasonable return," plaintiffs cannot succeed in their claim of confiscation. *Id.*; see *Troy Hills Village v. Parsippany-Troy Hills Tp.*, 68 *N.J.* 604, 621

(1975); *cf. FPC v. Texaco, Inc.*, 417 *U.S.* 380, 391–392, 94 *S.Ct.* 2315, 2323–2324, 41 *L.Ed.*2d 141 (1974); *Permian Basin Area Rate Cases*, 390 *U.S.* 747, 769–770, 88 *S.Ct.* 1344, 1361–1362, 20 *L.Ed.*2d 312 (1968).

The presence of vandalism which may occasionally frustrate a landlord's remedial measures does not necessarily prevent all possibility of a fair return. *Cf. Property Owners Ass'n of North Bergen v. North Bergen Tp.*, 74 *N.J.* 327 (1977). Indeed, the problems of persistent vandalism may in part be caused by the landlord's failure to provide adequate security for his properties—a failure that would violate his obligation to tenants in possession under his implied warranty of habitability, see *Trentacost v. Brussel, supra.* Since the landlord must provide security when tenants are present, we find unpersuasive his claim that he cannot recoup a fair portion of the expense for such security to protect the condition of the apartment while vacant. We are not concerned in this proceeding with who ultimately bears the cost of compliance with Paterson's housing code. That issue will probably be resolved by the city's rent control scheme.[17]

We therefore hold that plaintiffs have not satisfied their burden of demonstrating that Paterson's certification scheme prevents them from earning a just and reasonable return on their rental properties.

### C

We now address plaintiffs' contention that the standard governing the issuance of temporary certificates—"minor violations"—is so vague as to constitute an excessive delegation of discretion to municipal housing inspectors. Under the July amendments, "minor violation" is defined as "a departure from the City's Basic Housing Property Maintenance Code which still leaves the housing space in substantial compliance with such Code." See *supra* at 223. According to plaintiffs, "substantial

---

[17]Whether and how a rent control ordinance may directly compel the maintenance of housing in accord with local regulations is the issue presented by *Orange Taxpayers Council v. City of Orange, supra, also decided today.*

compliance" gives insufficient guidance to city officials when they are deciding whether to grant a temporary certificate.

"The requirement for a standard relates to the delegation of legislative power." *Switz v. Kingsley*, 37 *N.J.* 566, 581 (1962). Legislative standards insure that the exercise of official discretion under a delegation of authority will not contravene the underlying goals which prompted the delegation. See *Spiegle v. Beach Haven*, 46 *N.J.* 479, 493 (1966), *cert.* den. 385 *U.S.* 831, 87 *S.Ct.* 63, 17 *L.Ed.*2d 64 (1966); *Adams Newark Theatre Co. v. Newark*, 22 *N.J.* at 479; *Ward v. Scott*, 11 *N.J.* 117, 123 (1952).

In the familiar words of Mr. Justice Cardozo, the discretion may not be "unconfined and vagrant"; it must be "canalized within banks that keep it from overflowing." *Panama Ref. Co. v. Ryan*, 293 *U.S.* 388, 440, 55 *S.Ct.* 241, 256, 79 *L.Ed.* 446, 469 (1935) (dissenting opinion). [*Switz v. Kingsley*, 37 *N.J.* at 581]

Plaintiffs do not challenge the precision of the housing code regulations themselves; they argue that nothing in the code or the ordinance indicates the content of "substantial compliance." Yet in determining whether local legislation is impermissibly vague, we are not confined to its literal terms. The meaning of such a general standard may be implied from "the entire act in the light of its surroundings and objectives." *Ward v. Scott*, 11 *N.J.* at 123; see *Motyka v. McCorkle*, 58 *N.J.* 165, 177–178 (1971). The ordinance's "Statement of Policy" announced that the purpose of the ordinance was "to protect the health, safety and welfare of the citizens of the City of Paterson." It follows that a rental dwelling in "substantial compliance" with the housing code would present no serious or immediate threat to health, safety or welfare. See *Houman v. Mayor and Council Pompton Lakes*, 155 *N.J.Super.* 129, 169–170 (Law Div.1977). Such a construction yields a standard that falls short of mathematical certainty, but is nevertheless "sufficiently precise and clear to permit intelligent understanding and enforcement." *Adams Newark Theatre Co.*, 22 *N.J.* at 479; see *J.D. Land Corp. v. Allen*, 114 *N.J.Super.* 503, 512 (App.Div.1971); *cf. Marini v. Ireland*, 56 *N.J.* 130 (1970).

The generality of a legislative delegation does not necessarily entail unbridled official discretion. See *State v. Hotel Bar*

*Foods,* 18 *N.J.* 115, 124 (1955). For example, the presence of such simple standards as "public convenience and necessity," *N.J.S.A.* 48:11–1 (repealed, *L.*1962, *c.* 198), and "just and reasonable," *N.J.S.A.* 48:2–21, does not constitute an excessive delegation of legislative power to the Board of Public Utility Commissioners. See *Ward v. Scott,* 11 *N.J.* at 124; *cf. Yakus v. United States,* 321 *U.S.* 414, 64 *S.Ct.* 660, 88 *L.Ed.* 834 (1944) ("generally fair and equitable" an adequate standard for maximum rents). Legislative guidelines need only be as specific as their subject matter will permit. See *Spiegle,* 46 *N.J.* at 493; *Bechler v. Parsekian,* 36 *N.J.* 242, 255 (1961).[18] The Paterson ordinance has its purpose the protection of health, safety and welfare. A distinction between "substantial compliance" with the housing code and the presence of conditions that seriously threaten health, safety or welfare cannot be articulated in greater detail without the danger of drawing arbitrary distinctions. We therefore hold that the ordinance's definition of "minor violation" is "sufficiently clear and definite to furnish adequate information as to what was intended and to act as a restraint against arbitrary enforcement." *Spiegle,* 46 *N.J.* at 493.

D

Plaintiffs argue that the inspection of a vacant apartment prior to a new tenancy constitutes a warrantless search in violation of the Fourth Amendment of the United States Constitution. They rely principally on *Camara v. Municipal Court,* 387 *U.S.* 523, 87 *S.Ct.* 1727, 18 *L.Ed.2d* 930 (1967), which held that the resident of a dwelling could not be prosecuted for refusing to permit a warrantless inspection by local housing officials. The ordinance that had authorized the inspection in *Camara* provided at a minimum for annual inspections of occupied residences for violations of the local housing code. See *Id.* at

[18]"Indeed in recent days we have attached greater significance to the presence of procedural and judicial safeguards against unreasonable and unwarranted agency action than we have to the presence of details in the statutory standards." *Motyka v. McCorkle,* 58 *N.J.* at 178.

525 n. 1, 87 *S.Ct.* at 1729 n. 1. The Supreme Court held that the privacy interests of the resident were not diminished merely because the inspection was administrative and not criminal in nature. *Id.* at 530–531, 87 *S.Ct.* at 1731–1732. Requiring a warrant kept the occupant free from "the discretion of the official in the field." *Id.* at 532, 87 *S.Ct.* at 1733. Without a warrant,

> when the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization. [*Id.*]

The requirement of a warrant stated in *Camara* was extended to commercial premises in *See v. Seattle*, 387 *U.S.* 541, 87 *S.Ct.* 1737, 18 *L.Ed.*2d 943 (1967). See also *Marshall v. Barlow's, Inc.*, 436 *U.S.* 307, 98 *S.Ct.* 1816, 56 *L.Ed.*2d 305 (1978).

A number of differences serve to distinguish the inspection at issue in *Camara* from that authorized by the Paterson ordinance. The first is the diminished nature of the landlord's privacy interest in an apartment he is making available for rent. Unlike in *Camara*, the apartments subject to inspection are vacant. The inspection occurs at a time "immediately prior" to when the landlord relinquishes his right to possession of the premises to the tenant. Unlike the tenant in *Camara*, the landlord is not using the dwelling as his residence or place of business. The landlord's expectation of privacy regarding one of his vacant properties would necessarily be attenuated.

 From the perspective of the Fourth Amendment, the most important feature of the Paterson ordinance is that a housing inspector has no discretion regarding which dwellings are to be searched. See *Delaware v. Prouse*, 440 *U.S.* 648, 662, 99 *S.Ct.* 1391, 1400, 59 *L.Ed.*2d 660 (1979). Under the ordinance an inspection occurs only when the landlord requests one. It is restricted to a determination of compliance with each of the several standards contained in the housing code. Both the scope and the timing of an inspection are known by the landlord in advance. The inspection process itself provides the "visible manifestations of the field officers' authority" which makes the

assurances of a warrant unnecessary. *United States v. Martinez-Fuerte*, 428 *U.S.* 543, 559, 96 *S.Ct.* 3074, 3086, 49 *L.Ed.*2d 1116 (1976). Finally, the inspection has no connection with a criminal investigation; the presence of violations, even the failure to request an inspection, has no punitive consequences for the landlord. Thus the inspection simply seeks to establish the basis for the municipality's certificate of occupancy—a license to rent. *Cf. Wyman v. James*, 400 *U.S.* 309, 325–326, 91 *S.Ct.* 381, 389–390, 27 *L.Ed.*2d 408 (1971) (recipient of welfare payments may not refuse home visit by case-worker without risking termination of benefits).

United States Supreme Court cases regarding the warrant requirement focus on the increased protection that a warrant affords individual privacy.

> The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search * * *. [*Marshall v. Barlow's, Inc.*, 436 *U.S.* at 323, 98 *S.Ct.* at 1825–1826 (footnote omitted)]

None of the dangers and all of the advantages of this characterization are presently found in the Paterson inspection scheme. A warrant requirement in the ordinance would thus appear to be superfluous. We therefore hold that the Paterson ordinance contains all the necessary protection against unreasonable searches and is not subject to the Warrant Clause of the Fourth Amendment.

### E

██ We next address plaintiffs' contention that the prohibition of renting an apartment which does not conform to housing code standards establishes a penalty for code violations in excess of that authorized by *N.J.S.A.* 40:49–5. That statute provides in part:

> The governing body [of a municipality] may prescribe penalties for the violation of ordinances it may have authority to pass, either by imprisonment in the county jail or in any place provided by the municipality for the detention of prisoners, for any term not exceeding 90 days, *or by a fine not exceeding $500.00*, or both. [emphasis supplied]

The Paterson ordinance prohibits the rental of an apartment which is not in substantial compliance with its housing code. According to plaintiffs, this prohibition amounts to a penalty in the amount of the rent forfeited—an amount that can easily exceed $500—in punishment for housing code violations. See *Modular Concepts, Inc. v. South Brunswick Tp.*, 146 *N.J.Super.* 138, 145 (App.Div.1977), certif. den. 74 *N.J.* 262 (1977).

"A penalty, generally speaking, in the manner of money, is a sum paid or required to be paid by way of punishment for violation of law." *Zuest v. Ingra*, 134 *N.J.L.* 15, 18 (E & A 1946). We find that the prohibition of renting a defective dwelling embodied in the ordinance does not constitute a penalty or forfeiture for two reasons. The first is that the ordinance does not profess an intention to punish a landlord for the defective conditions of an apartment, so long as he does not attempt to rent it. The intent of the prohibition is not punitive, but rather "to prevent and abate conditions * * * harmful to the health and safety of * * * the general public in the municipality." *N.J.S.A.* 40:48–2.12a. Pursuant to a valid delegation of legislative authority, the City of Paterson has determined that apartments containing serious violations of its housing code constitute a threat to the health, safety and welfare of the city's inhabitants. The ordinance enjoins such offensive conditions by preventing a landlord from renting the defective apartment until he has brought the premises into substantial compliance. This ordinance constitutes solely regulation in the first instance; it exacts a fine only if the landlord rents an apartment without obtaining a certificate of occupancy. See *supra* at 220–221.

The second reason why the prohibition of renting is not a penalty is that the ordinance does not require the payment of a sum of money to the city in the event an apartment does not comply with the housing code. The regulatory scheme does deprive a landlord of income, but this does not result in the assessment of a punitive sanction to be paid to the city's treasury. We therefore find that the regulation of the condition

of Paterson's housing stock accomplished by the ordinance does not involve the assessment of a "penalty."

F

Plaintiffs challenge the exemption of owner-occupied, two-family dwellings as violative of the Equal Protection Clause, *U.S.Const.*, Amend. XIV. They do not allege the existence of a fundamental interest in conducting their business as landlords; nor do they claim that landlords constitute a constitutionally suspect class. Plaintiffs therefore must bear the heavy "burden of demonstrating that the classification lacks any rational basis." *Salorio v. Glaser*, 82 *N.J.* 482, 516 (1980). See *San Antonio School District v. Rodriguez*, 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.* 2d 16 (1973); *McGowan v. Maryland*, 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961); *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 80 *N.J.* 6, 39–40 (1976), app. dism. and *cert.* den. *sub nom. Feldman v. Weymouth Tp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). "[T]he separate treatment must admit of but one conclusion beyond a rational doubt, *i. e.*, that the basis therefore is arbitrary and unreasonable and without relevance to the legislative goal." *State v. Smith*, 58 *N.J.* 202, 207 (1971).

We find that the exemption of owner-occupied buildings has a rational basis. Landlords who live in their buildings have greater incentive to maintain them in accord with minimum standards of habitability. They are also more readily available to answer tenants' complaints. The city not only acts rationally, but efficiently when it decides to conserve its enforcement resources for larger buildings with absentee landlords. Plaintiffs' claim that the ordinance denies them the equal protection of the laws is therefore without merit.

G

The final claim raised by plaintiffs is that the ordinance operates to deprive them of the use of their rental properties without due process of law, again in violation of the Fourteenth

Amendment. Specifically, they claim that the delay which may ensue between a request for an inspection and the city's determination of compliance deprives them of the rental income they would earn if the ordinance permitted inspections while apartments were occupied.

The April amendment to the ordinance provided for an expedited inspection procedure. If the landlord has a prospective tenant immediately ready to take occupancy, the landlord can request that an inspection take place within one business day. If the city fails to perform the inspection, the landlord is deemed to have been issued a temporary certificate and may permit the tenant to take possession. Thus the ordinance provides for a maximum deprivation of one day's rent.

It is now well settled that the requirements of procedural due process in a specific matter are determined by a weighing and balancing of "three distinct factors":

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Mathews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18 (1976)]

An examination of these three factors in the context of housing inspection reveals that the inspection scheme of the Paterson ordinance reasonably accommodates both private and governmental interests. The landlord's private economic interest in a single business day's rent, while undeniably real, does not rise to the level of hardship which results when administrative procedures "deprive an *eligible* recipient of the very means by which to live while he waits." *Goldberg v. Kelly*, 397 *U.S.* 254, 264, 90 *S.Ct.* 1011, 1018, 25 *L.Ed.*2d 287 (1970); see *Mathews*, 424 *U.S.* at 340–341, 96 *S.Ct.* at 905–906. The loss of a single day's rent each time an apartment becomes vacant does not present a strong case for more elaborate procedural protection.

█ The trial court found that approximately one-half of Paterson's rental dwellings contain violations of the city's housing regulations. Thus it appears that the deprivation of rent might occur, at most, in approximately one-half of the properties subject to the inspection scheme. This further reduces the weight of the private interest in greater procedural safeguards. Finally, we must again recognize that the least burdensome alternative for the city—conducting inspections while apartments are occupied—will involve a substantial waste of resources due to uncooperative or absent tenants. On balance, it does not appear that the effects of the vacancy requirement for inspection so harms the landlord's legitimate economic interests as to make the scheme an unreasonable balance of public and private interests.[19] Accordingly, we find that the inspection scheme of the Paterson ordinance does not deprive the plaintiffs of their right to due process of law.

### Conclusion

We have found that there exists ample legislative authorization for the efforts of the City of Paterson to combat the deteriorating conditions of its rental housing stock. The challenges brought by plaintiffs to the specific provisions of the inspection scheme are lacking in merit. We therefore conclude that the Paterson ordinance is a valid exercise of municipal authority. Accordingly, the judgment of the Appellate Division is affirmed.

*In affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*In reversal*—none.

---

[19]Although the plaintiffs' due process claims are confined to the prohibition of a new tenancy before inspection, we note that the ordinance provides for administrative review of the results of an inspection. See *supra* at 222.