NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3298-17T3

FRATERNAL ORDER OF
POLICE, NEWARK LODGE
NO. 12,

     Plaintiff-Respondent,

v.

CITY OF NEWARK,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 18, 2019**
>
> **APPELLATE DIVISION**

Argued May 13, 2019 – Decided June 18, 2019

Before Judges Messano, Fasciale and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000177-16.

Avion M. Benjamin argued the cause for appellant (Kenyetta K. Stewart, Newark Corporation Counsel, attorney; Avion M. Benjamin and Alana Miles, of counsel and on the briefs).

Matthew D. Areman argued the cause for respondent (Markowitz & Richman, attorneys; Matthew D. Areman, on the brief).

Avram D. Frey argued the cause for amici curiae American Civil Liberties Union of New Jersey and

Newark Communities for Accountable Policing (Gibbons, PC, attorneys; Jeanne LoCicero, Legal Director, American Civil Liberties Union, attorney; Lawrence S. Lustberg, Avram D. Frey, and Jeanne LoCicero, on the brief).

Gurbir S. Grewal, Attorney General, attorney for amicus curiae Attorney General of New Jersey (Melissa H. Raksa, Assistant Attorney General, of counsel; Joseph C. Fanaroff, Assistant Attorney General, on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

This appeal requires that we determine the validity of an Ordinance (the Ordinance) enacted by defendant City of Newark (the City), which created a civilian complaint review board (the CCRB) in response to an alarming "pattern or practice of constitutional violations" by the Newark Police Department (NPD). The United States Department of Justice (DOJ) uncovered the violations after a lengthy and thorough investigation of the NPD, which led to the entry of a consent decree in a federal lawsuit. The creation of the CCRB is the City's decisive legislative policy response to the DOJ's findings, which tackled the problem head on.

The City appeals from an order granting summary judgment to plaintiff Fraternal Order of Police, Newark Lodge No. 12 (FOP). FOP is the exclusive

collective negotiations representative for NPD officers. The order permanently enjoined the City from "implementing and/or enforcing" the Ordinance, "except to the extent" that the Ordinance authorized the CCRB to "serve strictly in an oversight capacity . . . ." The practical effect of the order stopped the CCRB from functioning as intended because it precluded the CCRB from investigating alleged police misconduct, prevented the CCRB from utilizing subpoena power, and thwarted implementation of the City's policy decision, which was intended to definitively promote accountability, transparency, and public confidence in the NPD.

We must address numerous legal questions, especially whether the City validly set policy. We acknowledge that N.J.S.A. 40A:14-118 expressly authorizes the City to create a board – such as the CCRB – to investigate and examine allegations of police misconduct. But the same statute charges the Chief of Police (the Chief) with responsibility for efficient and routine day-to-day operations of the police force. Therefore, one of the primary legal questions on this appeal is whether the Ordinance has infringed upon the Chief's statutory mandate.

Understanding that the Ordinance also cannot alter the NPD's obligation to follow the Attorney General Guidelines (AG Guidelines) when undertaking

A-3298-17T3

its own internal affairs (IA) investigations, we hold that the Ordinance is valid on its face with two exceptions. First, the Ordinance infringes upon the Chief's statutory rights by making the CCRB's findings of fact binding, absent clear error, and second, the Ordinance improperly permits disclosure of complainant and police officer identities. Otherwise, we conclude that the CCRB can function as intended under the Ordinance, including providing an oversight role by investigating alleged police misconduct, conducting hearings, participating in the development of a disciplinary matrix, making recommendations, and issuing subpoenas.

We therefore affirm in part and reverse in part.

I.

In May 2011, the DOJ, in conjunction with the Special Litigation Section of the Civil Rights Division and the United States Attorney's Office for the District of New Jersey, opened an investigation of the NPD. It did so after receiving "serious allegations of civil rights violations" by NPD officers. The investigation spanned a period of three years.

In July 2014, upon the conclusion of its investigation, the DOJ released a forty-nine page report that communicated its findings and recommendations to City officials and the NPD (the DOJ report). The DOJ acknowledged the "skills

4

and dedication of the many [NPD] officers who abide by the rule of law and commit themselves daily to the difficult, and too often thankless, job of protecting public safety."  Indeed, the DOJ report expressly states that the DOJ's findings "are not meant to detract from these officers' efforts."  We also do not intend to undermine the important work that police officers perform.

Nevertheless, the DOJ report reflects that its investigation

> showed a pattern or practice of constitutional violations in the NPD's stop and arrest practices, its response to individuals' exercise of their rights under the First Amendment, the [NPD's] use of force, and theft by officers.  The investigation also revealed deficiencies in the NPD's systems that are designed to prevent and detect misconduct, including its systems for reviewing force and investigating complaints regarding officer misconduct.  The investigation also identified concerns that do not appear to amount to patterns of constitutional misconduct, but which nonetheless are significant and warrant consideration by the NPD. These concerns relate to the NPD's practices in dealing with potentially suicidal detainees, the NPD's sexual assault investigations, and the impact of the NPD's policing on the [lesbian, gay, bisexual, and transgender] LGBT community.

The DOJ found recurrent problems with the IA function of the NPD,[1] such as the failure to collect evidence from complainants, to "probe officers' accounts or assess officer credibility," and to give witness statements "sufficient weight." The DOJ identified instances of needless and unnecessary use of Miranda[2] warnings when interviewing complainants and witnesses with the effect of intimidating and discouraging their participation. And it determined that the disciplinary system lacked "transparent [and] objective criteria," resulting in arbitrary decisions. The DOJ report concluded that the NPD failed to investigate "officers with high numbers of credible complaints," and that these officers "continued to work on the force . . . without any discipline or other corrective action[.]" The DOJ concluded that these patterns and practices undercut the community's trust and confidence in the NPD.

Like the DOJ, the New Jersey Attorney General (AG) has similarly recognized that a failure in the IA function leads to a "negative impact on the administration of criminal justice and the delivery of police services," which

---

[1] The NPD currently refers to its IA department as the Office of Professional Standards (OPS). For the sake of consistency, and to avoid confusion by adding another acronym, we refer to it as the IA department.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

6

inevitably erodes "the respect and support of the community" and possibly results in civil lawsuits. AG Guidelines on Internal Affairs Policy & Procedures, at p. 5.

As to its finding that the constitutional violations resulted in a significant lack of accountability, the DOJ report stated:

> The NPD has neither a functioning early warning system nor an effective [IA] structure. Those inadequacies undermine the Department's ability to identify and address officer misconduct. The NPD's data collection and analysis, and its system for regular review of officer use of force, are similarly deficient.
>
> One indication of the ineffectiveness of the NPD's [IA] system is that the [IA] Unit . . . sustained only one civilian complaint of excessive force out of hundreds received from 2007 through 2012. While there is no "right" rate at which force complaints should be sustained, only one finding of unreasonable force out of hundreds of complaints over a six-year period is symptomatic of deeply dysfunctional accountability systems. The NPD also has failed to adequately collect or analyze data about officers' use of force, stops, or arrests. Nor has the NPD taken adequate steps to implement an early warning system that would track and identify officers' problematic behavior. As a result of these systematic deficiencies, the NPD does not discern or respond to problematic trends in officer conduct that could constitute or lead to misconduct.
>
> [(Emphasis added).]

The DOJ determined that the IA system "tacitly permit[ted] [police] officers to engage in such conduct," and crucially, that the NPD knew about the problems but failed to address them. The DOJ report itself reflects that the City agreed in principle to "establish a civilian oversight entity for the NPD" and to "revise its [IA] practices to ensure effective complaint intake, objective investigations of misconduct, and fair and consistent discipline."[3]

On March 3, 2016, the United States of America filed a complaint against the City in the United States District Court for the District of New Jersey, alleging that the City was liable for the acts or omissions of the NPD. The complaint referenced the DOJ report and its investigative findings and conclusions. By filing the complaint, the United States attempted to remedy the "pattern or practice" of the NPD that "has deprived persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States." The United States sought to enjoin the NPD from further alleged

---

[3] Under the agreement, in April 2015, the Mayor acted swiftly and issued an executive order establishing a CCRB. Two months later, the then-Police Director issued a proposed disciplinary matrix, with the goal of providing a uniform manner of addressing progressive and corrective discipline within the NPD. The CCRB, as contemplated by the executive order, never convened, and the matrix was not adopted in the manner prescribed by the executive order. The executive order and its related proposed disciplinary matrix are not the subject of the present litigation.

misconduct, and requested that the City "adopt and implement policies and procedures to remedy the pattern or practice of unconstitutional and unlawful conduct described [in the complaint]." This litigation was resolved a few weeks later, on March 30, 2016, with a consent decree, which was subsequently revised on April 29, 2016.

On March 17, 2016, fourteen days after the federal complaint was filed, the City enacted the Ordinance, establishing the CCRB. In creating the CCRB, the City joined multiple other cities nationwide with similar boards.[4] The Ordinance is the embodiment of the City's legislative policy decision to enable transparent investigation and examination into allegations of police misconduct. The Ordinance details the CCRB's structure, power, and duties, which we will outline.

As to its structure, the CCRB shall consist of eleven members of the public, appointed by the Mayor, with the advice and consent of the Municipal

---

[4] This includes New York City, Chicago, Philadelphia, Houston, Washington D.C., Dallas, Baltimore, Miami, Las Vegas, Detroit, Memphis, Milwaukee, San Francisco, Honolulu, Atlanta, Prince George's County, Indianapolis, Cleveland, St. Louis, Cincinnati, Albuquerque, and Portland. See Udi Ofer, Getting It Right: Building Effective Civilian Review Boards to Oversee Police, 46 Seton Hall L. Rev. 1033, 1053-61 (2016).

Council.  Newark, NJ, Code (Code) 2:2-86.1(a)(2)(a).[5]  One member shall be the City's Inspector General, who will "serve as the administrative head of the Board," Code 2:2-86.1(a)(2)(c); three members shall be elected members of the Municipal Council, or their designees; and the remaining seven members shall be selected from individuals recommended by seven organizations identified in the Ordinance.  Code 2:2-86.1(a)(2)(a).[6]"In selecting representatives to serve on the CCRB, nominators are encouraged to consider potential members' professional experience in law, civil rights or law enforcement."  Code 2:2-86.1(a)(2)(a).  But "[n]o member of the [CCRB], excluding the Inspector General, shall be former employees of the NPD."  Code 2:2-86.1(a)(2)(c).  Training for CCRB members "shall be predominately obtained from such independent, third party bodies or institutions that have experience with regard to [IA] and civilian review investigations and audits."  Code 2:2-86.5, § 1-23.

---

[5]  Newark's Code codified the Ordinance.

[6]  They are the (1) American Civil Liberties Union (ACLU) – New Jersey; (2) National Association for the Advancement of Colored People – New Jersey; (3) People's Organization for Progress; (4) La Casa de Don Pedro; (5) Ironbound Community Corporation; (6) Newark Anti Violence Coalition; and (7) the clergy, meaning any person who provides moral, spiritual, or philosophical guidance as a profession.  Code 2:2-86.1(a)(2)(a).  By a separate ordinance adopted July 1, 2016, the City replaced La Casa de Don Pedro with a representative from the LGBT community.

As to the CCRB's powers and duties, the Ordinance authorizes the CCRB to "consider and make recommendations to the Public Safety Director,[7] Mayor, Municipal Council, and the public [pertaining] to policies and procedures concerning the general investigation of complaints by the Division of Police as well as its [IA] procedures." Code 2:2-86.3(d). It authorizes the CCRB to "investigate and make recommendations regarding practices and/or patterns of behavior that are problematic with regard to" police interactions with the public. Code 2:2-86.3(d). Along these lines, the CCRB must request certain information from the NPD on a quarterly basis. Code 2:2-86.5, § 1-21(b).

The Ordinance also authorizes the CCRB to review the findings, conclusions, and recommendations arising from the NPD's internal investigations of individual complaints of police misconduct, as follows:

> At the conclusion of the [NPD]'s investigation of a complaint or behavior, the [CCRB] shall have the power to conduct a review of the findings, conclusion and recommendations of the Division of Police (Investigation Review). The [CCRB] shall report its findings of the Investigation Review to the Public Safety Director. A semi-annual report of the Investigation Reviews shall be submitted to the Mayor, Public Safety Director and the Municipal Council. The [CCRB] may utilize all the powers set forth in this Section 2:2-86 to carry out the Investigation Reviews.

---

[7] Pursuant to a different 2016 ordinance, the City established a Department of Public Safety, in which the Division of Police is a sub-division. Code 2:22.

[Code 2:2-86.3(b) and Code 2:2-86.5, § 1-02(d).]

The City expressly declared that the Ordinance was intended to allow the CCRB to make recommendations to the Public Safety Director. The City did not create the CCRB to impose discipline on police officers. Specifically, the City, via the Ordinance, empowered the CCRB to consider and make recommendations as to policies and procedures concerning

> the general investigation of complaints by the Division of Police as well as its [IA] procedures, and with regard to evidence of practices or patterns of behavior or practice that is problematic with regard to the interaction of the Division of Police with the public at large, as well as any failures of communication with regard thereto.

[Code 2:2-86.5, § 1-02(c).]

The Ordinance authorizes the CCRB to conduct its own investigations of complaints filed by members of the public (including NPD members) against any member of the NPD. The CCRB can do so not to adjudicate complaints or impose discipline – as it lacks such power under the Ordinance – but rather to investigate alleged police misconduct and make recommendations. The Ordinance therefore gives the CCRB concurrent jurisdiction with the NPD to investigate complaints or behavior. Code 2:2-86.3(c). More specifically, the ordinance states:

The [CCRB] shall have the power to receive, investigate, hear, make findings and recommend action upon complaints by members of the public (including, but not limited to[,] complaints made by other police officers or personnel) against uniformed and sworn personnel of the NPD that allege misconduct involving inappropriate behavior or actions, including but not limited to[,] excessive use of force, abuse of authority, unlawful arrest, unlawful stop, unlawful searches, discourtesy or use of offensive language, including, but not limited to, slurs relating to race, ethnicity, religion, gender, age, sexual orientation, gender identity or expression, and disability, theft, and any other categories protected under law. Any member of the public is intended to have the broadest possible meaning and interpretation.

[Code 2:2-86.3(a).]

The CCRB shall notify the NPD of any complaints it receives and indicate whether it will (1) "contemporaneously initiate a parallel investigation of the [c]omplaint or behavior with the Division of Police; and/or" (2) "not investigate the [c]omplaint or behavior but will conduct an Investigation Review upon the Division of Police's conclusion of its investigation . . . ." Code 2:2-86.5, § 1-06. The Ordinance prevents the CCRB from "constrain[ing] or chang[ing] . . . the obligations of the Division of Police to conduct appropriate and timely investigations of NPD uniform and sworn members of [the] NPD and to be compliant and consistent with the requirements of N.J.S.A. 40A:14-147." Code 2:2-86.5, § 1-16(d).

To make its own investigation meaningful, the CCRB enjoys subpoena power under the Ordinance. "Upon a majority vote of members of the [CCRB], the [CCRB] may issue subpoenas ad testificandum and duces tecum, which may be served to the extent permitted by law." Code 2:2-86.3(f) and 2:2-86.5, § 1-10(e) (emphasis added). Under the Ordinance, the CCRB may: (1) make written or oral requests for information or documents; (2) interview the complainant, witnesses, and the subject officer to the extent consistent with the rights afforded to officers by law, the NPD, and in collective negotiations agreements (CNAs); and (3) make field visits to the site of the alleged misconduct. Code 2:2-86.5 §§ 1-10, 1-11.

As to interviews of police officers and other individuals, the Ordinance importantly refers to officers' constitutional protections and their rights set forth in CNAs.

> (a) It is the intent of these Rules not to alter the rights afforded to police officers by the NPD in standing orders or other rules and procedures or in collective negotiations contracts with respect to interviews so as to diminish such rights, if any, including but not limited to[,] any existing right to notice of an interview, the right to counsel, and the right not to be compelled to incriminate oneself.
>
> (b) A member of the Division of Police who is the subject of a complaint shall be given two business days' notice prior to the date of an interview, to obtain and

consult with representatives.  A member of the Division of Police who is a witness in an investigation of a complaint shall be given a period of time, up to two business days, to confer with [his or her] representatives.

(c)  All persons interviewed may be accompanied by up to two (2) individuals to act as their representative, inclusive of their chosen counsel.  Such counsel or representative may advise the person interviewed as circumstances may warrant, but may not otherwise participate in the proceeding.

(d)  Prior to the commencement of the interviewing of a police officer, the following statement shall be read to such officer:

You are being questioned as part of an official investigation of the [CCRB].  You will be asked questions specifically directed and narrowly related to the performance of your duties.  You are entitled to all the rights and privileges guaranteed by the laws of the State of New Jersey, the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself and the right to have legal counsel or such other representative present at each and every stage of this investigation, however that person may not unduly interfere or disrupt the proceedings.

(e)  Interviews shall be scheduled at a reasonable hour, and reasonable requests for interview scheduling or rescheduling shall be accommodated.  If possible, an interview with a police officer shall be scheduled when such officer is on duty and during daytime hours.  Interviews may be conducted at the [CCRB's] offices or other locations designated by the [CCRB].

(f)    The interviewer shall inform the interviewee of the name and position of the person in charge of the investigation, name and position of the interviewer, the identity of all persons present at the interview, whether the interviewee is a subject or a witness in the investigation, the nature of the complaint and information concerning all allegations, and the identity of witnesses and complainants, except that addresses need not be disclosed and confidential sources need not be identified unless they are witnesses to the alleged incident.

(g)    The interviewer shall not use off-the-record questions, offensive language or threats, or promise of reward for answering questions.

(h)    The interviewer shall regulate the duration of question periods with breaks for such purpose as meals, personal necessity and telephone calls. The interviewer shall record all recesses.

(i)    Interviews shall be recorded by the CCRB. No other recordings are permitted.

(j)    If an interviewee needs an interpreter, he or she shall advise the interviewer of such need as soon as possible after being notified of the date and time of the interview. A qualified interpreter will be obtained from an official registry of interpreters or another reliable source.

(k)    Reasonable accommodations shall be made for persons with disabilities who are participating in an interview. Persons requiring such accommodations shall advise the [CCRB] of such need as soon as possible after being notified of the date and time of the interview.

    A-3298-17T3

[Code 2:2-86.5 § 1-11 (emphasis added).]

The Ordinance requires the CCRB to report its review of every complaint to the Public Safety Director, as well as "all relevant forms, memoranda and background information to assist the Public Safety Director in making [his or her] final disciplinary determination."  Code 2:2-86.5 § 1-17(a).

The Ordinance contemplates that the CCRB will make findings of fact and propose disciplinary recommendations to the Public Safety Director.  For example:

> The [CCRB] shall use an established discipline matrix and guidelines to recommend discipline for outcomes resulting from investigations and complaints filed with the [CCRB] and/or the NPD.  Said discipline matrix and guidelines shall act as safeguards to ensure the consistent application of discipline and should include aggravating and mitigating factors.  The discipline matrix and guidelines should be developed by the Public Safety Director and affected bargaining units, in conjunction with the CCRB, and must accord with any Consent Order or Judgment with the United States [DOJ].

> [Code 2:2-86.3(j).]

But the Ordinance violates the law, as we will later explain, by requiring the Public Safety Director to accept the CCRB's findings of fact.  This part of the Ordinance improperly provides:

17

> The [CCRB] shall provide its findings of fact to the Public Safety Director and, absent clear error, the Public Safety Director shall accept those findings of fact. The [CCRB] shall also make disciplinary recommendations, and the Public Safety Director shall make all disciplinary decisions based on the CCRB's findings of fact, absent clear error, and consistent with the matrix and guidelines.
>
> [Code 2:2-86.3(k).]

According to the Ordinance: "Clear error exists when the CCRB's findings of fact are based upon obvious and indisputable errors and cannot be supported by any reasonable interpretation of the evidence." Code 2:2-86.5 § 1-17(b). The practical effect of this requirement, as we will explain later, is that it interferes with the Chief's statutory responsibility for the routine day-to-day operations of the force.

Notwithstanding the binding nature of the CCRB's findings – which we invalidate – the Public Safety Director nevertheless retains the authority and discretion to make final disciplinary determinations. Code 2:2-86.4(d) and 2:2-86.5 § 1-16(a). This is so because the Ordinance specifically limits the CCRB's authority.

> The provisions of this section shall not be construed to limit or impair the authority of the Public Safety Director to discipline members of the NPD nor obviate the responsibility of the NPD to investigate citizen complaints or incidents to which NPD is made known,

18

involving uniformed and sworn members of the NPD, and to promptly inform the CCRB of all such complaints or incidents.[8] Nor shall the provisions of this section be construed to limit the rights of members of the NPD with respect to disciplinary action, including, but not limited to[,] the right to notice and a hearing, which may be established by any provisions of law or otherwise.

[Code 2:2-86.4(d).]

The Ordinance further states that it should not be construed to interfere with other external investigations of NPD members:

e.      The provisions of this Ordinance shall not be construed to prevent or hinder the investigation or prosecution of a member of the NPD for violations of law by any court of competent jurisdiction, a grand jury, [c]ounty or [s]tate [p]rosecutor or any other authorized officer, agency or body.

f.      The processing and review of civilian complaints shall not be deferred because of any pending or parallel disciplinary proceeding or criminal investigation unless such request for deferment is made by the office of a [c]ounty [p]rosecutor or a [s]tate or [f]ederal law enforcement agency or prosecutor or by a court order.

---

[8] We emphasize that the Ordinance cannot alter the NPD's obligation to comply with the AG Guidelines as part of the NPD's IA investigations. But the AG Guidelines do not prevent the NPD from disclosing to a municipal oversight body, such as the CCRB, "citizen complaints or incidents to which NPD is made known, involving uniformed and sworn members of the NPD," especially because the CCRB is also required to maintain confidentiality. Furthermore, this Ordinance disclosure requirement is consistent with the oversight authority granted to municipalities under N.J.S.A. 40A:14-118.

[Code 2:2-86.4(e)–(f).]

The Ordinance also addresses complainant confidentiality and correctly guarantees confidentiality during the investigatory process, but – improperly – not at public hearings.

> During the investigatory process, neither the identity of, nor personally-identifiable information about, complainants or witnesses shall be released beyond the CCRB staff, [CCRB] members, and NPD staff engaged in the specific investigation of the complainant's allegation. <u>If the complaint is substantiated and is referred to a CCRB hearing, the complainant's identity may be released in the course of any public hearing about the alleged misconduct</u>.
>
> [Code 2:2-86.5, § 1-07 (emphasis added).]

We invalidate this part of the Ordinance. A complainant's identity should always remain confidential, for reasons that we express later in our opinion. Moreover, although this section of the Ordinance only addresses the confidentiality of complainants and witnesses, other parts of the Ordinance require the CCRB to maintain the subject officers' confidentiality in its public reporting, <u>see</u> Code 2:2-86.5 §§ 1-17(d), 1-20(a), 1-21(a), consistent with the

AG Guidelines at p. 44.[9] We emphasize that a police officer's identity should remain confidential as well.

The CCRB also must publish certain information on its website, on a quarterly basis, "with personally identifiable information redacted." Code 2:2-86.5, § 1-21(a). And the CCRB must publish an annual report on its website, with statistical information, identifying "trends, patterns, areas of concern, <u>or areas of excellence</u>," in the NPD's practices. Code 2:2-86.5, § 1-21(c) (emphasis added). The Ordinance also sets the procedures for the CCRB to report case dispositions to complainants. Code 2:2-86.5, § 1-22.

The April 29, 2016 consent decree that terminated the federal litigation against the City reflected the <u>minimum</u> duties and responsibilities of the CCRB. Section V, Paragraph A of the consent decree provides in pertinent part that the CCRB "shall, at a <u>minimum</u>," perform

> substantive and independent review of internal investigations and the procedures for resolution of civilian complaints; monitoring trends in complaints, findings of misconduct, and the imposition of discipline; and reviewing and recommending changes to NPD's policies and practices, including, but not limited to, those regarding use of force, stop, search, and arrest.

[9] The Ordinance is also subordinate to other State law, for example, the Open Public Records Act (OPRA), which provides for the confidentiality of personnel records in the possession of a public agency. N.J.S.A. 47:1A-10.

The consent decree appointed a former Attorney General of the State of New Jersey to act as an independent monitor and to ensure compliance with the consent decree.

In August 2016, FOP filed an order to show cause and a verified complaint. FOP alleged ultra vires creation of subpoena power by the Ordinance, in violation of N.J.S.A. 40:48-25 and the Faulkner Act, N.J.S.A. 40:69A-36 (Count One). It contended that there existed an inconsistency between the Ordinance and the AG Guidelines and discipline of police officers by the IA division, in violation of the Law Enforcement Officers Protection Act, N.J.S.A. 40A:14-181 (Count Two). It alleged that the Ordinance deprived officers of due process, in violation of N.J.S.A. 40A:14-147, N.J.S.A. 11A:2-13, and N.J. Const. art. I, ¶ 1 (Count Three). Finally, FOP claimed that the Ordinance violated N.J.S.A. 40A:14-118, by infringing on the Chief's rights (Count Four).

The judge entertained cross-motions for summary judgment and invalidated the Ordinance with two exceptions: (1) the CCRB could perform an oversight function, and (2) the CCRB could consult with the Public Safety Director and NPD in the creation of the discipline matrix. In his oral opinion, the judge "expressly prohibited" the CCRB "from engaging in investigations,

22

hearings, adjudications, or the issuance of subpoenas relating to police misconduct and/or discipline[.]"

## II.

On appeal, the City argues that the Ordinance does not violate N.J.S.A. 40A:14-118; the judge erroneously concluded (sua sponte) that the Ordinance violates due process rights; N.J.S.A. 40A:14-181 and the AG Guidelines do not preempt the Ordinance; and the judge erred by concluding that the CCRB's subpoena power was invalid.

The ACLU joins the contentions made by the City. The ACLU emphasizes that neither N.J.S.A. 40A:14-181 nor the AG Guidelines preempt municipal regulation in the field of civilian complaints of police misconduct. Additionally, the ACLU maintains that the City correctly implemented its own police power – relying on its home rule authority – and properly established legislative policy consistent with N.J.S.A. 40A:14-118.

FOP maintains that the Ordinance contravenes N.J.S.A. 40A:14-118 because it transfers the power to administer and discipline police officers from the Police Chief to the CCRB; disregards police officers' due process rights; violates N.J.S.A. 40A:14-181 and the AG Guidelines; and improperly empowers the CCRB with subpoena power.

The AG, who accepted our invitation to appear as amicus, primarily contends that the Ordinance violates N.J.S.A. 40A:14-118 by giving the CCRB's findings dispositive weight unless clearly erroneous. The AG argues the Ordinance "impermissibly assigns to the CCRB functions that the [statute] assigns to the [Chief]," maintaining that the CCRB's purported authority to "conduct investigations, find facts, and make recommendations for the discipline of officers and members of the police force falls within the ambit of the [C]hief's authority under the statute."

## III.

We begin by addressing the City's argument that the Ordinance is consistent with N.J.S.A. 40A:14-118. We agree, with one exception: the Ordinance interferes with the Chief's statutory rights by making the CCRB's findings of fact binding, absent clear error. To analyze this argument, we must interpret the statute, giving the Ordinance a presumption of validity. Indeed, our standard of review is well settled.

"In matters of statutory interpretation, our review is de novo." Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017). "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492

(2005). In reading the text of the statute, courts should "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole[.]" Ibid. (citations omitted). "[I]f there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" Id. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

Municipal ordinances are "afforded a presumption of validity[.]" Grabowsky v. Twp. of Montclair, 221 N.J. 536, 551 (2015). Accord Hawthorne PBA Local 200 v. Borough of Hawthorne, 400 N.J. Super. 51, 60 (App. Div. 2008). Moreover, our State constitution and case law require us to liberally construe the law in favor of municipal authority and an ordinance's validity. N.J. Const. art. IV, § 7, ¶ 11; 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 221 N.J. 318, 339-40 (2015). Thus, statutes, like the one here, that delegate to municipalities the authority to adopt ordinances on a particular subject, should be read expansively. Holmdel Builders Ass'n v. Twp. of Holmdel, 121 N.J. 550, 566 (1990); In re Egg Harbor Assocs., 94 N.J. 358, 366-67 (1983).

A-3298-17T3

We first analyze the power N.J.S.A. 40A:14-118 gives to the Chief and the City. After that, we address the City's establishment of local policy and its authority to do so. And then, we specifically respond to FOP's contention that the CCRB infringes upon the Chief's day-to-day operations of the force.

A.

Broadly speaking, N.J.S.A. 40A:14-118 authorizes municipalities to create a police department and appoint a police chief as the head of that department. Pursuant to the statute, the police chief is responsible for the department's day-to-day operations, and reports to the "appropriate authority" within the municipal government, who is responsible for promulgating rules and regulations for the control of the police force. The statute also authorizes municipalities to investigate and examine the operations of their police forces, and individual members thereof.

Thus, N.J.S.A. 40A:14-118 recognizes two things: "[T]he principle of non-interference of elected officers individually in the operation of the police force"; and "the power of the governing body to conduct official investigations of the police force, and the power of executive and administrative officers in their official capacity to examine the operations of the police force and the performance of any officer therein." S. Cty. & Mun. Gov't Comm. Statement to

26

S.1243 (Nov. 24, 1980). Accord Assembly Judiciary, Law, Public Safety & Defense Comm. Statement to Assembly Comm. Substitute for S.1243 (June 22, 1981).

Consistent with this statute, the City enacted an ordinance providing for a Department of Public Safety, headed by the Director of Public Safety, containing the Division of Police, headed by the Chief of Police. The Chief reports to the Mayor through the Public Safety Director, who, as the "appropriate authority," is responsible for adopting rules and regulations for the NPD, including the imposition of discipline of police officers. Code 2:22. See PBA Local 160 v. Twp. of N. Brunswick, 318 N.J. Super. 544, 552 (App. Div. 1999) (stating that under N.J.S.A. 40A:14-118, "[t]he appropriate authority adopts rules and regulations for the department, and the discipline of the members; additionally, the appropriate authority establishes policies for the daily operations of the department. The appropriate authority is a civilian position.").

As we stated in Gauntt v. City of Bridgeton, 194 N.J. Super. 468, 486 (App. Div. 1984),

> [i]n the context of N.J.S.A. 40A:14-118 which in part spells out the relationship of the municipal governing body, including its appropriate executives, and the chief of police, we deem the authority to fix policy as one comprehending the formulation of fundamental principles to serve as broad guides to the chief of police

in making his decisions with respect to discharging his responsibility for the efficiency and routine day to day operation of the police department.

[(Emphasis added).]

Thus, the Code provides that the Public Safety Director is the "Chief Executive Officer of the Police Division," Code 2:22-2.2(i), and is responsible for "[m]ak[ing], administer[ing] and enforc[ing] rules and regulations for the control, disposition and discipline of the Department of Public Safety, and of its officers and employees in all of its Divisions and Offices." Code 2:22-2.2(j).

The Code also establishes a Division of Police, Code 2:22-3, and sets forth the duties of the Police Chief. Code 2:22-3.3. Under the Code,

> [t]he Police Chief shall be the head of the Police Force and shall be directly responsible to the Mayor through the Public Safety Director designated by the Mayor as the Appropriate Authority for the Police Force's efficiency and day to day operations and shall carry out the powers and duties established under N.J.S.A. 40A:14-118 . . . .
>
> [Code 2:22-3.3(c).]

N.J.S.A. 40A:14-118 expressly grants certain rights to a chief of police, and certain rights to a governing body. As to the rights afforded to a chief of police, the plain text of the statute provides:

> Any such ordinance, or rules and regulations, shall provide that the chief of police, if such position is

established, <u>shall be</u> the head of the police force and that he shall be <u>directly responsible</u> to the appropriate authority <u>for the efficiency and routine day to day operations thereof</u>, and that he shall, <u>pursuant to policies established by the appropriate authority</u>:

> a. <u>Administer and enforce</u> rules and regulations and special emergency directives for <u>the disposition and discipline of the force</u> and its officers and personnel[.]

[N.J.S.A. 40A:14-118 (emphasis added).]

As this statute is applied in Newark, the Director of Public Safety exercises a great deal of control over the disciplinary process within the NPD. For example, the Code provides that the Director of Public Safety shall:

> k. Establish procedures for the hearing and determination of charges of violation of departmental rules and regulations by any member of the Police Division provided that a member may be fined, reprimanded, removed, suspended or dismissed from the Division only on written charges made or preferred against him or her, after such charges have been examined, heard and investigated by a Disciplinary Trial Board selected from among the members of the Police Division as provided for herein, upon such reasonable notice to the member charged, and according to such practice, procedure and manner as may be prescribed by rules and regulations of the Department.
>
> . . . .

29

> m.  Be responsible for appointing members to serve on the Disciplinary Trial Boards . . . .
>
> [Code 2:22-2.2(k), (m).]

The Director of Public Safety assigns NPD officers to the IA Department. Also, members of the IA Department investigate complaints of alleged officer misconduct and provide completed reports through the chain of command to the Public Safety Director.  Thereafter, should a complaint be sustained, the Public Safety Director is responsible for directing that charges be prepared, signed, and served upon the subject officer or employee.

Meanwhile, pursuant to N.J.S.A. 40A:14-118 and the Code, the Police Chief is responsible for day-to-day operations of the NPD, with members of the IA Department responsible to the Police Chief, through their chain of command. The IA Department's completed reports go through the chain of command, and thus to the Police Chief, and to the Director of Public Safety.  And, should the Director of Public Safety direct that an officer be charged, the Police Chief then becomes responsible for implementing the disciplinary process and administering discipline, pursuant to established rules and regulations.

As to the rights afforded to a municipal governing body, the plain text of the statute authorizes the creation of a board such as the CCRB, for the purpose

A-3298-17T3

of investigating and examining, at any time, the operations of the police force, stating:

> Nothing herein contained <u>shall prevent the appointment by the governing body of committees or commissions to conduct investigations of the operation of the police force, and the delegation</u> to such committees or commissions <u>of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation</u> authorized by law. <u>Nothing</u> herein contained <u>shall prevent the appropriate authority</u>, or any executive or administrative officer charged with the general administrative responsibilities within the municipality, <u>from examining at any time the operations of the police force or the performance of any officer or member thereof</u>.
>
> [<u>Ibid.</u> (emphasis added).]

The statute does not expressly define or limit the meaning of "examine," or for that matter, "investigate." Merriam-Webster defines "examine" as "to inspect closely," "to test the condition of," "to inquire into carefully," or "to interrogate closely." And it defines "investigate" as "to observe or study by close examination and systematic inquiry" and "to conduct an official inquiry." <u>Merriam-Webster's Collegiate Dictionary</u> 434, 639 (11th ed. 2012). Consistent with our standard of review, we apply these ordinary definitions when interpreting the text of N.J.S.A. 40A:14-118.

Notably, "examining" and "investigating" appear in the paragraph of the statute that expressly contemplates investigations of police misconduct by municipal government bodies. Also importantly, "the courts and the Legislature have long recognized that because police officers are different from other public employees, the scope of discretion accorded to the public entities that administer police departments is necessarily broad." City of Jersey City v. Jersey City PBA, 154 N.J. 555, 572 (1998).

### B.

By adopting the Ordinance and creating the CCRB, the City proactively addressed the variety of problems uncovered by the DOJ. It made a policy decision to encourage transparency, protect its citizenry, and root out unfair treatment by the NPD. The City took control of the situation – characterized by the judge as "broken" – by addressing the specific needs of its community.

The City adopted the Ordinance as an exercise of its police power, invoking the doctrine of home rule expressed in the New Jersey State Constitution, Article IV, § VII, ¶ 11:

> The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of

necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.

"Home rule is basic in our government" and "embodies the principle that the police power of the State may be invested in local government to enable local government to discharge its role as an arm or agency of the State and to meet other needs of the community." Inganamort v. Borough of Ft. Lee, 62 N.J. 521, 528 (1973). Home rule permits each municipality to act in a way it believes will best meet the local need. W. Morris Reg'l Bd. of Educ. v. Sills, 58 N.J. 464, 477 (1971).

"Whether the State alone should act or should leave the initiative and the solution to local government, rests in legislative discretion." Inganamort, 62 N.J. at 528. The presumption of the validity of local legislative action is constrained by the obvious understanding that "[a] statute has supremacy over an ordinance," In re Ordinance 04-75, 192 N.J. 446, 469 (2007), and "a local municipality is but a creature of the State, capable of exercising only those powers granted to it by the Legislature . . . . " Moyant v. Paramus, 30 N.J. 528, 535 (1959). See also Dome Realty, Inc. v. Paterson, 83 N.J. 212, 225 (1980) ("[M]unicipalities, being created by the State, have no powers save those delegated to them by the Legislature and the State Constitution.").

33

N.J.S.A. 40:48-2, which is akin to the necessary and proper clause in the United States Constitution,[10] gives a municipality broad general police power, stating:

> Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem <u>necessary and proper</u> for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be <u>necessary</u> to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.
>
> [(Emphasis added).]

Moreover, the City derives further governmental power under the Faulkner Act, which the Legislature enacted to present New Jersey's municipalities "with various optional methods of organizing their local governments." <u>Keuerleber v. Twp. of Pemberton</u>, 260 N.J. Super. 541, 544 (App. Div. 1992). In <u>Keuerleber</u>, we pointed out that the Faulkner Act was "intended to confer upon the municipalities the <u>greatest possible powers of local self-government and home rule</u> consistent with the Constitution of this State." <u>Ibid.</u> (emphasis added).

---

[10] <u>U.S. Const.</u>, art. I, § 8, cl. 18.

Any specific enumeration of municipal powers contained in this act or in any other general law shall not be construed in any way to limit the general description of power contained in this article, and any such specifically enumerated municipal powers shall be construed as in addition and supplementary to the powers conferred in general terms by this article. All grants of municipal power to municipalities governed by an optional plan under this act, whether in the form of specific enumeration or general terms, shall be liberally construed, as required by the Constitution of this State, in favor of the municipality.

[N.J.S.A. 40:69A-30 (emphasis added).]

Our Supreme Court provided further guidance – especially in the context of N.J.S.A. 40A:14-118 – on what constitutes accepted policy properly entrusted to municipal government. This guidance is particularly relevant here. In Falcone v. De Furia, 103 N.J. 219 (1986), the Court analyzed the validity of an ordinance that provided for appointment of detectives to the police force with approval by the governing body.

The Court considered the authority accorded the police chief under N.J.S.A. 40A:14-118, and addressed whether the designation of a detective is more like an appointment/promotion than an assignment of a subordinate within the police force. Id. at 224. The former is permanent and not subject to change at the discretion of the chief of police. Ibid. The latter pertains to a chief of police's statutory responsibility to conduct the routine day-to-day operations of

the police force.  Ibid.  The Falcone Court held that the designation of detectives was a policy decision because "detectives [were] entrusted with . . . more sensitive responsibility" and because "the appointment of detectives [was] permanent, and not subject to changes at the discretion of the chief [of police.]"  Ibid.[11]

Therefore, applying Falcone and Gauntt, a governing body decision constitutes a matter of policy properly entrusted to a municipal government when it concerns "fundamental principles" that are intended to serve as "broad guides to the chief of police," and where the determination concerns a "sensitive responsibility" and is not subject to change by the discretion of the chief of police.  Id. at 224-25.  Here, the City addressed "fundamental principles" pertaining to constitutional violations and related problems uncovered by the DOJ by developing a system for transparent investigations into police misconduct.  It did so while simultaneously employing the City's express right, under N.J.S.A. 40A:14-118, to investigate and examine the police force and its members.  And the City's local determination to create a board, such as the

---

[11] Recall that in Newark, the Director of Public Safety appoints officers to the IA department.

CCRB, concerns the City's "sensitive responsibility" to ensure law-enforcement accountability, which is not subject to change by the discretion of the Chief.

C.

Notwithstanding the express statutory authority to investigate and examine the operations of the police force or any officer/member, and even though the City responsibly set local policy enabling transparency and police accountability, FOP correctly maintains that the CCRB interferes with the Chief's day-to-day routine operations of the force in one limited way. As previously discussed, and as counsel conceded at oral argument before us, the Chief's day-to-day routine operations of the force include supervising the IA Department, through the chain of command, administering the disciplinary process, and imposing any resulting discipline. That part of the Ordinance requiring the Director of Public Safety to accept as binding the CCRB's findings of fact, absent clear error violates N.J.S.A. 40A:14-118 to the extent it makes the CCRB's factual findings paramount to the findings of the IA department. In this respect, the Ordinance impermissibly undermines the Chief's statutory authority to run the NPD's day-to-day operations by rendering the results of the IA Department's investigation nugatory and commandeering the disciplinary process.

The Ordinance expressly provides that it "shall not be construed to limit or impair the authority of the Public Safety Director to discipline members of the NPD . . . ." Code 2:2-86.4(d). And the CCRB rules provide that as to the recommendations of the CCRB, "[t]he Public Safety Director shall retain in all respects the authority and discretion to make final disciplinary determinations." Code 2:2-86.5, § 1-16(a). The CCRB can only make recommendations to the Public Safety Director as to the appropriate discipline. It cannot impose discipline. By imposing binding findings on the Public Safety Director – and by extension, the Chief – this part of the Ordinance does more than establish policies, rules, and regulations. We conclude, though, that the CCRB can still meet its objectives even without imposing such a requirement.

The statute expressly authorizes municipalities to set rules and regulations for their police departments. It is essentially undisputed that participating in the creation of a disciplinary matrix does not interfere with the Chief's routine day-to-day operations of the force. Indeed, N.J.S.A. 40A:14-118 contemplates that a governing body may "provide for the maintenance, regulation and control" of a police force, including "the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members." But by "expressly prohibit[ing]" the CCRB "from

38

engaging in investigations, hearings, . . . or the issuance of subpoenas relating to police misconduct and/or discipline," as the judge ordered, the CCRB cannot examine or investigate alleged police misconduct as contemplated by N.J.S.A. 40A:14-118, or the policy set by the City.

FOP maintains that the CCRB renders the IA process meaningless and divests the Chief of his powers. But the Ordinance plainly states that the Public Safety Director "shall retain in all respects the authority and discretion to make final disciplinary determinations." Code 2:2-86.5, § 1-16(a). As such, the City is correct in classifying the CCRB as "solely a [B]oard of fact finding, investigatory review and public transparency, designed to provide civilian oversight [in]to the [NPD], and to make recommendations to the Public Safety Director as to what discipline the Public Safety Director should impose within his authority, and at his discretion." The CCRB has no power to impose "minor or major discipline" upon NPD officers. It can only make recommendations to the Public Safety Director after reaching its own findings and by using a disciplinary matrix developed by the Public Safety Director, bargaining units,

and the CCRB. Thus, absent the binding nature of its findings, the CCRB will not interfere with the Chief's oversight role of investigations by IA.[12]

In concluding that the Ordinance violates N.J.S.A. 40A:14-118, the judge relied on Gauntt, 194 N.J. Super. 468, overruled in part by Falcone, 103 N.J. 219. Gauntt is a different case entirely. In Gauntt, the Police Director violated N.J.S.A. 40A:14-118(c) (reserving to the Chief the power to "[p]rescribe the duties and assignments of all subordinates and other personnel"). There is no such violation or contention here. And in Gauntt, we considered a different ordinance than the Ordinance at issue here.

In Gauntt, we concluded that the Police Director interfered with the responsibilities and duties of the chief of police and therefore violated Section (c) of the statute. 194 N.J. Super. at 487. He did this by requiring an IA officer to report to him rather than the chief of police, ibid.; assigning an officer to investigate a purported theft of money in the clerk's office, ibid.; assigning a lieutenant and detective to a neighborhood crime watch, id. at 487-88;

---

[12] Another part of the Ordinance provides that the Public Safety Director may need to explain his or her reasons for not following the disciplinary recommendations of the CCRB. Code 2:2-86.5, § 1-17(c). We conclude that aspect of the Ordinance is facially valid, and, as we will later explain, is subject to as applied challenges. Notwithstanding that aspect of the Ordinance, we emphasize that the CCRB's findings of fact and recommendations are not binding.

A-3298-17T3

overruling the chief of police's decision to appoint an individual as head of the detective division, id. at 488; removing detectives from homicide investigation school and ordering the chief of police to assign an officer to attend a breathalyzer course, ibid.; ordering a police department secretary to post a sign-up list to work on a specific police shift, id. at 489; and temporarily appointing a lieutenant to the position as acting chief of police, id. at 490-91.

> As its plain language confirms, the Legislature amended the statute to simply "redefine the relationship between a municipal governing body and the chief of police." [Falcone, 103 N.J. at 221]. As amended, N.J.S.A. 40A:14-118 limited the authority of municipalities to regulate the [IA] of police departments, designated properly-appointed chiefs of police as the heads of police forces, and granted such chiefs the authority to "[p]rescribe the duties and assignments of all subordinates and other personnel." N.J.S.A. 40A:14-118(c). The amended statute thus "sought to avoid undue interference by a governing body into the operation of the police force." Falcone, 103 N.J. at [222].
>
> [Paff v. Ocean Cty. Prosecutor's Office, 235 N.J. 1, 21 (2018) (third alteration in original).]

Here, the Ordinance does not prescribe the duties and assignments of subordinates and other personnel.

We recognize that the current version of N.J.S.A. 40A:14-118 gives chiefs of police "express statutory authority . . . to avoid undue interference by a

governing body into the operation of the police force." Falcone, 103 N.J. at 222. But the Ordinance was not intended to, nor does it, divest the Chief of his statutory authority to oversee investigations by IA. Thus, other than making the CCRB's findings binding, the Ordinance does not divest the Chief of his responsibility under the statute.

IV.

We do not share the judge's general view that the entire Ordinance violates due process on its face. Of course, both the federal and state constitutions protect against the deprivation of life, liberty, or property without due process of law. U.S. Const. amend. XIV; N.J. Const. art. 1, ¶ 1; Doe v. Poritz, 142 N.J. 1, 99 (1995). Fundamentally, procedural due process entails notice and an opportunity to be heard. Doe, 142 N.J. at 106. "Due process is not a fixed concept, however, but a flexible one that depends on the particular circumstances." Ibid. Accord In re Promulgation of Guardianship Serv. Regulations, 103 N.J. 619, 632 (1986).

Due process considerations are premature at this point because the Ordinance contemplates the development of further procedural safeguards once the CCRB is up and running. Along those lines, Code 2:2-86.5, § 1-08 requires the CCRB to develop "procedures" for investigating complaints to best facilitate

42

"accurate, orderly and thorough fact-finding." Code 2:2-86.3(e) contemplates that the CCRB may propose amendments to those "procedures," subject to public comment. Code 2:2-86.4(d) provides safeguards for "members of the NPD with respect to disciplinary action" by expressly stating that their rights shall not be limited "to the right to notice and a hearing, which may be established by any provisions of law or otherwise." And Code 2:2-86.5, § 1-23 mandates that CCRB board members must be appropriately trained. A full due process analysis is premature because multiple sections of the Ordinance anticipate the need to establish procedural due process protections. An as applied due process challenge, if warranted, may be raised on a more fully developed record.

We disagree with the judge's general conclusion that the "potential for political mischief with [the CCRB] is evident." The judge reached that determination noting that prospective CCRB members would be members of organizations that advocated changing the structure of an existing ineffective method of disciplining police. But a decisionmaker is not disqualified "simply because he [or she] has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" Hortonville

Joint Sch. Dist. v. Hortonville Educ. Ass'n, 426 U.S. 482, 493 (1976) (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)). As such, "policymakers with decision making power" are afforded a "presumption of honesty and integrity." Id. at 497.

Disqualification is not "automatically required merely because a decisionmaker has announced an opinion on a disputed issue." In re Carberry, 114 N.J. 574, 585 (1989). "[A]ctual bias or a likelihood of bias must appear if an otherwise valid administrative sanction is to be overturned because of a denial of due process." In re Seidman, 37 F.3d 911, 925 (3d. Cir. 1994). "[A]ctual bias is grounds for disqualification when the decisionmaker has a pecuniary interest in the outcome of the matter or has been the target of personal criticism from one seeking relief." Carberry, 114 N.J. at 586. On its face, we see no evidence of such bias on the part of prospective CCRB members, or an inability of the CCRB to be neutral or detached.

It is important to remember that the CCRB does not adjudicate cases. It operates as an investigatory and oversight body. It has no authority to discipline officers. Based upon the investigations performed by staff members, the CCRB produces a report, consisting of findings of fact and recommendations for disciplinary action, which it provides to the Director of Public Safety. However,

the CCRB does not take disciplinary action against any officer, nor does it make any disciplinary rulings. It also does not interfere with the NPD's internal investigatory and disciplinary procedures, or the court's role in reviewing cases under the civil service law. The CCRB does not function as an adversarial board.

After receiving the investigation report, it is the Director of Public Safety, and not the CCRB, who determines the appropriate disciplinary action, if any. If disciplinary charges are appropriate, officers will be subject to the internal disciplinary proceedings of the NPD. Thereafter, they may pursue appeals through any available administrative and judicial processes, and they may pursue any rights they might have under their CNAs. On its face, the Ordinance does not interfere with any due process rights that officers may have in these other proceedings.

Based upon an IA investigation report, or a CCRB investigation report, or both, the Director of Public Safety may decide to file disciplinary charges against an officer. In making that decision, the Public Safety Director is not bound by the CCRB's findings, as the Ordinance provides. As a matter of due process and fundamental fairness, Doe, 142 N.J. at 108-09, the Public Safety

45

Director should consider all of the facts presented, and must be permitted to consider the entirety of the evidence.

On this record, there is no evidence demonstrating that the CCRB could not perform its oversight function and simultaneously investigate matters contemporaneously with and independently of ongoing investigations conducted by IA. And of course, any such concurrent investigation is subject to being stopped by a prosecutor or court. Code 2:2-86.4(e)–(f). The United States Supreme Court explained that,

> [t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing. Without a showing to the contrary, state administrators "are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."
>
> [Withrow v. Larkin, 421 U.S. 35, 55 (1975) (quoting Morgan, 313 U.S. at 421).]

"If an interested party has a right to cross-examine witnesses and present proof, the mere fact that an administrative agency has conducted an investigation and formulated a policy position does not necessarily mean that the mind of the agency head is closed." Carberry, 114 N.J. at 586. "The combination of investigative, charging, and adjudicative functions in the same administrative

tribunal does not, without more, constitute a violation of due process." Ende v. Cohen, 296 N.J. Super. 350, 362 (App. Div. 1997).

Although "[i]t has often been argued that casting the same individuals within an agency in these dual roles violates due process," the "general rule is that proof of actual bias is necessary to overturn administrative actions on this basis." In re Opinion No. 583, 107 N.J. 230, 236 (1987). There is no such proof here. "The wisdom of creating an agency with a responsibility for both initiating and adjudicating a proceeding is a legislative function, and not a judicial one." In re Bd. of Educ. of Trenton, 176 N.J. Super. 553, 565 (App. Div. 1980). "[T]he mere fact that the administrative agency has investigated the matter in question does not render it or its members incompetent, consistent with due process, to adjudicate the case as presented at the evidentiary hearing." Id. at 565-66 (alteration in original).

Finally, at this point, we perceive no facial concerns with one additional provision of the Ordinance. The Ordinance requires the Public Safety Director to provide an explanation, in writing, and potentially in person before the CCRB, when he or she disagrees with the CCRB's findings of fact, or chooses to impose discipline that is of a lower level than that recommended by the CCRB. Code

2:2-86.5, § 1-17(c).  On its face, such a requirement does not violate due process, N.J.S.A. 40A:14-118, or Newark's Code.

Requiring the Public Safety Director to explain his or her reasons for rejecting the CCRB's findings or recommendations serves a legitimate public interest because the Public Safety Director's responses will assist the CCRB in performing its oversight functions, including as required under the consent decree.  This provision of the Ordinance serves the legitimate public interests of transparency and improving the critical relationship between the NPD and the Newark community.  And it is consistent with that part of N.J.S.A. 40A:14-118 allowing for investigations by boards like the CCRB, it promotes police accountability in ways beyond those contemplated by the IA function, and it complements the Public Safety Director's general obligation to report to the Mayor.  Indeed having the Public Safety Director – under the circumstances described in the Ordinance – explain his or her reasons to the CCRB cannot interfere with the Chief's day-to-day operations of the police force because it is the Public Safety Director – not the Chief – who may have to appear before the CCRB.  Nevertheless, as the CCRB gets up and running, as applied challenges to this part of the Ordinance may be made on a more fully developed record if warranted.

V.

We now move to the subject of preemption. A local government, like the City, may not act contrary to State law. FOP maintains that the City acted contrary to State law by enacting an Ordinance that purportedly conflicts with N.J.S.A. 40A:14-181 and the AG Guidelines. Therefore, FOP argues that the doctrine of preemption requires that we invalidate the Ordinance.

N.J.S.A. 40A:14-181 and the AG Guidelines do not expressly address the Ordinance's grant of oversight authority to the CCRB. Indeed, the statute is directed towards law enforcement agencies (which the CCRB is not), and the AG Guidelines are designed to assist law enforcement agencies, enhance their integrity, improve delivery of police services, and ensure proper consideration of police misconduct.

N.J.S.A. 40A:14-181 states in part that,

> Every law enforcement agency, . . . shall adopt and implement guidelines which shall be consistent with the guidelines governing the "[IA] Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety, and shall be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements.
>
> [(Emphasis added).]

The text of this statute does not expressly state that an executive or legislative agency is barred from concurrently investigating police misconduct – as part of a CCRB with broad oversight authority to statutorily investigate and examine complaints of police misconduct – when a law enforcement agency has adopted and implemented guidelines consistent with those promulgated by the AG.

To be sure, the AG has issued guidelines pursuant to this statute, and as chief law enforcement officer of the State, N.J.S.A. 52:17B-98, these guidelines are binding upon local law enforcement agencies. O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371, 384 (App. Div. 2009); In re Carroll, 339 N.J. Super. 429, 439, 442-43 (App. Div. 2001).[13] The AG Guidelines pertain to law enforcement agencies. The AG Guidelines recognize that proper administration of the IA function is "a critical issue for the criminal justice system in New Jersey today," (AG Guidelines, at p. 3), with the IA function viewed by the courts "as an important means of protecting the constitutional rights and civil liberties of the state's citizens." (AG Guidelines, at p. 3). The Guidelines state:

> Agencies that make a vigorous commitment to the [IA] process signal their desire to comply with the highest

---

[13] The most recent AG Guidelines on IA Policy & Procedures are dated November 2017. See https://www.state.nj.us/lps/dcj/agguide/internalaffairs200 0v1_2.pdf (last visited May 22, 2019). In its summary judgment papers, FOP referred to the 2014 version of the AG Guidelines. We apply the most recent guidelines, as did the judge.

standards of professionalism in law enforcement. They also ensure that their officers will be accountable for their actions to both the agency and the community. Agencies that fail to make such a commitment run the risk of failing to uncover policies, practices and procedures that may undermine legitimate efforts to provide the highest quality law enforcement services.

Indifference to the [IA] function will have a negative impact on the administration of criminal justice and the delivery of police services to New Jersey's citizens. Agencies that fail to make the [IA] function a priority can lose the respect and support of the community. The integrity of individual law enforcement agencies, and the reputation of the State's criminal justice system, can also suffer if agencies fail to identify and correct officer misconduct. In addition, law enforcement agencies that fail to implement a meaningful and objective [IA] process may be found liable in civil lawsuits for their failure to effectively address officer misconduct.

[(AG Guidelines, at p. 5; see also AG Guidelines at pp. 31, 46) (emphasis added).]

As we have said, the purpose of the AG Guidelines "is to assist the State's law enforcement agencies with investigating and resolving complaints of police misconduct that originate with private citizens or are generated by the supervisors, officers or employees of a law enforcement agency." (AG Guidelines at p. 3) (emphasis added). And the stated goal of the AG Guidelines is "to enhance the integrity of the State's law enforcement agencies, improve the delivery of police services and assure the citizens of New Jersey that complaints

of police misconduct are properly addressed." (AG Guidelines at p. 3) (emphasis added).

The AG Guidelines contain the following eleven mandates, which every law enforcement agency must implement:

> 1. Each agency must establish by written policy an [IA] function.
>
> 2. Each agency must accept reports of officer misconduct from any person, including anonymous sources, at any time.
>
> 3. Where a preliminary investigation indicates the possibility of a criminal act on the part of the subject officer, the county prosecutor must be notified immediately. No further action should be taken, including the filing of charges against the officer, until the county prosecutor so directs.
>
> 4. The agency must notify the county prosecutor immediately of any use of force by an officer that results in death or serious bodily injury.
>
> 5. Each agency must thoroughly and objectively investigate all allegations against its officers.
>
> 6. Each agency must notify its officers of complaints and their outcomes.[14]
>
> 7. Each agency must notify complainants of the outcomes of their complaints.

---

[14] The Ordinance does not explicitly contain this requirement. However, since the Ordinance requires the CCRB to notify the NPD of any complaints it receives, the NPD's IA Department will provide such notice to officers.

8.    Each <u>agency</u> must establish and maintain an [IA] records system which, at a minimum, will consist of an [IA] index system and a filing system for all documents and records.  In addition, each <u>agency</u> shall establish a protocol for monitoring and tracking the conduct of all officers.

9.    Each <u>agency</u> must submit quarterly reports to the county prosecutor summarizing the allegations received and the investigations concluded for that period.  Each county prosecutor shall establish a schedule for the submission of the reports and specify the content of the reports.

10.    Each <u>agency</u> must annually release reports to the public summarizing the allegations received and the investigations concluded for that period.  These reports shall not contain the identities of officers or complainants.    In addition, each <u>agency</u> shall periodically release a brief synopsis of all complaints where a fine or suspension of [ten] days or more was assessed to an agency member.  The synopsis shall not contain the identities of the officers or complainants.

11.    Each <u>agency</u> shall ensure that officers assigned to the [IA] function complete training as mandated by the Division of Criminal Justice.

[(AG Guidelines at pp. 4-5) (emphasis added).]

The AG Guidelines next describe the fundamentals of the disciplinary process for law enforcement agencies, including a system of discipline, and a schedule of possible penalties when discipline is imposed.  (AG Guidelines at

pp. 6-11).  Thus, the Ordinance cannot impede the NPD's obligation – as part of

its IA investigations – to follow the AG Guidelines.

We reject the idea that preemption principles invalidate the Ordinance on

its face, because N.J.S.A. 40A:14-181 and the AG Guidelines apply to law

enforcement agencies and do not address a board like the CCRB, which has the

important and vital oversight role of providing transparency into investigations

of police misconduct.  We nevertheless perform a preemption analysis.

Although we see no inconsistency of consequence between how the CCRB

operates under the Ordinance and how the IA investigations occur under the

requirements imposed by the AG Guidelines or N.J.S.A. 40A:14-181, as with

our due process analysis, as applied challenges may be raised – if warranted –

once the CCRB begins functioning as intended under the Ordinance.  At this

point, we add the following remarks on preemption.

We review de novo the legal question of whether State law preempts the

Ordinance.  "[A] court may declare an ordinance invalid if it . . . is preempted

by superior legal authority."  Rumson Estates, Inc. v. Mayor of Fair Haven, 177

N.J. 338, 351 (2003) (citing United Bldg. & Constr. Trades Council v. Mayor of

Camden, 88 N.J. 317, 343 (1982)).  "Preemption is a judicially created principle

based on the proposition that a municipality, which is an agent of the State,

cannot act contrary to the State." Redd v. Bowman, 223 N.J. 87, 108 (2015) (citing Overlook Terrace Mgmt. v. Rent Control Bd. of W.N.Y., 71 N.J. 451, 461 (1976)).

"[A]n ordinance will fall if it permits what a statute expressly forbids or forbids what a statute expressly authorizes." Summer v. Twp. of Teaneck, 53 N.J. 548, 554 (1969). In analyzing the question of preemption, "[t]he ultimate question is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act." Id. at 555. "It is not enough that the Legislature has legislated upon the subject[.]" Id. at 554. Instead, for preemption purposes, the Legislature's intent to occupy the field "must appear clearly." Ibid. (emphasis added).

In Redd, our Supreme Court reiterated the five governing factors that a court must consider to determine whether state law preempts a municipal ordinance:

> (1) Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?
>
> (2) Was the state law intended, expressly or impliedly, to be exclusive in the field?

(3) Does the subject matter reflect a need for uniformity?

(4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?

(5) Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature?

[223 N.J. at 109 (quoting Overlook, 71 N.J. at 461-62).]

Applying these five factors, we reject FOP's contention that the statute, or for that matter, the AG Guidelines, preempt the Ordinance. Our conclusion does not undermine the importance of the AG Guidelines, or their applicability to law enforcement agencies.

(1)

We cannot say with confidence that the Legislature clearly intended to immobilize municipalities from promoting police accountability in ways beyond those contemplated by the IA function. Neither N.J.S.A. 40A:14-181 nor the AG Guidelines preclude municipalities from implementing a CCRB with oversight power to investigate and examine civilian complaints of police misconduct. Therefore, in that sense, the Ordinance does not permit what the Legislature has generally forbidden, or forbid what the Legislature has authorized.

Furthermore, reading the AG Guidelines to preclude civilian municipal investigations of police departments ignores not only the City's right to set policy, but also the City's express rights contained in N.J.S.A. 40A:14-118. As we previously stated, N.J.S.A. 40A:14-118 expressly permits:

> the appointment by the governing body of committees or commissions to conduct <u>investigations of the operation of the police force</u>, and the delegation to such committees or commissions of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law[; and] the appropriate authority, or any executive or administrative officer charged with the general administrative responsibilities within the municipality, [to] examin[e] at any time the operations of the police force <u>or the performance of any officer or member thereof.</u>

> [(Emphasis added).]

We make every effort to read N.J.S.A. 40A:14-118 and the Guidelines, adopted pursuant to N.J.S.A. 40A:14-181, as compatible. <u>See</u> <u>In re Petition for Referendum on City of Trenton Ordinance 09-02</u>, 201 N.J. 349, 359 (2010) (stating that when reviewing two separate statutes addressing the same subject matter, courts must read the statutes in <u>pari</u> <u>materia</u> and attempt to reconcile them). Here, the Ordinance does not replace an IA investigation with an investigation performed by the CCRB. Rather, the Ordinance provides for the possibility of concurrent investigations, and, as we have determined in this

opinion, the upshot of the investigation performed by the CCRB cannot bind the Public Safety Director when it comes to law enforcement disciplinary determinations.

(2)

Under the second factor, we conclude that there is no evidence that State law intended, either expressly or impliedly, to be exclusive in the field. That is, we do not read N.J.S.A. 40A:14-181 or the AG Guidelines as providing the exclusive means for the investigation of civilian complaints of police misconduct. The AG Guidelines do not preclude municipalities from creating separate entities to investigate complaints (solely in an oversight function). Once again, any such reading of N.J.S.A. 40A:14-181 or the AG Guidelines would violate N.J.S.A. 40A:14-118, which expressly empowers investigation and examination of police forces by boards like the CCRB, and contravenes the City's fundamental right to set local policy.

(3)

Under the third factor, there is no need for uniformity in the conclusions reached by separate IA and CCRB investigations. Regardless of whether the conclusions and recommendations made by the IA department and the CCRB conflict, it is the Public Safety Director who determines – without limitation –

whether any disciplinary action should be taken. We have already invalidated that part of the Ordinance that provided that the CCRB's findings would be binding. Thus, the Public Safety Director still determines disciplinary action, and does so by considering the entirety of the evidence. In this sense, the CCRB's investigation is consistent with State law and vitally promotes transparency and law enforcement accountability of the NPD.

(4)

Under the fourth factor, the state scheme is not so pervasive or comprehensive that it precludes the coexistence of municipal regulation. N.J.S.A. 40A:14-181 and the AG Guidelines do not preclude civilian municipal investigations into the police department or individual members of the police department. That is primarily so because such a reading ignores N.J.S.A. 40A:14-118, which explicitly permits such civilian investigations.

N.J.S.A. 40A:14-181 requires law enforcement agencies to adopt guidelines that are consistent with the AG Guidelines, any tenure or civil service law, and existing contractual agreements. The oversight role of the CCRB does not interfere in any way with a law enforcement agency's obligation under N.J.S.A. 40A:14-181 or the AG Guidelines. Thus, there exists room for important municipal regulation.

(5)

Under the fifth factor, the Ordinance importantly does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature.  The AG Guidelines state that "[t]he goals of the policy are to enhance the integrity of the State's <u>law enforcement agencies</u>, improve the delivery of police services and assure the citizens of New Jersey that complaints of police misconduct are properly addressed."  (AG Guidelines, at p. 3) (emphasis added).  The goal of the Ordinance is to further the same objectives, particularly in light of the NPD's past failures, as set forth in the DOJ's report.  In our view, the CCRB furthers, rather than impedes, the Legislature's objectives.

Moreover, the City's powers should not be constrained in an area in which the Legislature has expressly permitted municipalities to act.  <u>N.J. Const.</u> art. IV, § 7, ¶ 11; N.J.S.A. 40:48-2, N.J.S.A. 40:42-4, N.J.S.A. 40:69A-30.  In establishing an independent body to perform oversight of the NPD – in furtherance of quality policing and a trusting relationship between the community and the police – the City squarely acted within the authority granted to it by the Legislature.

Furthermore, the Ordinance does not permit CCRB investigations to interfere with or taint criminal prosecutions of police officers. Both the Ordinance and the AG Guidelines require coordination with the prosecutor's office, and deferral to the prosecutor's office, where potentially criminal conduct is at issue. (Compare AG Guidelines at pp. 20-22, 24, 32-38, with Code 2:2-86.4(e)–(f)). The only difference is that the Ordinance requires deferral of case processing only if a request for deferral is made by the prosecutor, federal law enforcement agency, or by court order.

The AG Guidelines and the Ordinance require training of investigatory staff. (Compare AG Guidelines, at p. 13, with Code 2:2-86.3(h), and 2:2-86.5, § 1-23). Also, the Ordinance requires the recusal of any Board members who have a conflict of interest. Code 2:2-86.5, § 1-24. To be sure, IA officers may have greater tools at their disposal for the investigation of complaints, based upon their access to the officer's workplace and their existence within the chain of command of the police department. (AG Guidelines, at pp. 25-31). However, that does not mean that CCRB investigations stand as an obstacle to accomplishing and executing the full objectives of the AG Guidelines. To the contrary, the fact that IA officers are police officers is a double-edged sword. Their experience creates the possibility of both better-informed analysis of the

61

evidence, as well as potentially biased analysis of the evidence. Civilian review provides a different perspective in furtherance of the same legislative objective.

The AG Guidelines provide that in publishing reports on IA investigations, law enforcement agencies "shall not" publish the names of complainants and subject officers. (AG Guidelines at p. 44). As to confidentiality of officers, like the AG Guidelines mandate for IA investigations, the Code requires that the identity of a police officer must remain confidential in any of the CCRB's public reporting. Code 2:2-86.5 §§ 1-17(d), 1-20(a), 1-21(a). By contrast, the Ordinance provides that if a complaint is substantiated and referred for a CCRB hearing, "the complainant's identity may be released in the course of any public hearing about the alleged misconduct." Code 2:2-86.5, § 1-07.

Disclosure of a complainant's identity could thwart an IA investigation, criminal investigation, or prosecution, or could disclose the name of an informant, and could taint an officer who was wrongfully accused. It could also discourage complainants from coming forward, or encourage unwarranted complaints from people seeking notoriety. For this reason alone, we elect to invalidate that part of the Ordinance allowing disclosure of a complainant's identity. But we uphold the remainder of the Ordinance sans the binding nature

of the CCRB's findings. See Brunetti v. Borough of New Milford, 68 N.J. 576, 603 (1975) (stating that the invalidity of the provisions of an ordinance does not affect the enforceability of the remainder of the ordinance because they are "clearly severable"). Such a conclusion is consistent with the severability paragraph of the Ordinance, which provides that if any part of the ordinance is declared unconstitutional or illegal, the remaining provisions shall not be affected and shall continue in full force and effect. See Code 1:1-10. Any other purported discrepancies between the AG Guidelines and the Ordinance can be addressed, if warranted, on an as applied challenge on a more fully developed record once the CCRB commences its oversight role under the Ordinance.

## VI.

Finally, the City has widespread authority to issue and delegate subpoena power to the CCRB.[15] This power is incidental to the City's policy and express statutory power under N.J.S.A. 40A:14-118 to create a CCRB for the limited purpose of providing oversight in investigating and examining complaints of police misconduct. Without such power to issue subpoenas, its effectiveness will be undermined.

---

[15] Indeed, in its amicus brief, the AG did not specifically raise an objection to the CCRB's subpoena power.

Code 2:2-86.3(f) authorizes the CCRB to issue subpoenas. It provides:

> The [CCRB] may require the production of . . . records and other materials as are necessary for the investigation of complaints submitted to the [CCRB], pursuant to this section [of the Ordinance] through the issuance of subpoenas. Upon a majority vote of the members of the [CCRB], the [CCRB] may issue subpoenas ad testificandum and duces tecum, which may be served, to the extent permitted by law.

By enacting the Ordinance, the City tailored the CCRB's subpoena power to the CCRB's task: investigating civilian complaints alleging police misconduct. The City specifically delegated this power to remedy the problems associated with the DOJ investigation. Indeed, the purpose of the Ordinance supplies sufficient guidance for the City's delegation.

Both the United States Supreme Court and the Supreme Court of New Jersey have recognized that a legislative body has the inherent authority to issue subpoenas to fulfill its legislative and investigative authority. See McGrain v. Daugherty, 273 U.S. 135 (1927); In re Shain, 92 N.J. 524 (1983). The Ordinance by itself does not grant the power to subpoena. The power to subpoena comes from constitutional and legislative authority. Shain, 92 N.J. at 532. "[S]uch authority may be fairly implied from the legislative scheme without being expressly stated within the four corners of a statute." Ibid. In reaching that conclusion, our Court relied on the rationale expressed in McGrain:

A-3298-17T3

A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

        . . . .

[S]tate courts quite generally have held that the power to legislate carries with it by necessary implication ample authority to obtain information needed in the rightful exercise of that power, and to employ compulsory process for the purpose.

[Id. at 532-33 (quoting McGrain, 273 U.S. at 175, 165) (alterations in original) (emphasis added).]

Thus, "[a] reasonable incident of the Council's power to investigate under N.J.S.A. 40:69A-37[16] is the power to compel testimony, i.e., to issue subpoenas." Id. at 533. Our Court elaborated:

---

[16] This statute is entitled "Investigative, removal powers" and states:

The council, in addition to such other powers and duties as may be conferred upon it by this charter or otherwise by general law, may:

> Unless an investigating committee has power to compel [documents and] testimony, it has no feasible method to obtain all the information it needs to perform its legislative function. <u>Without the power to interrogate knowledgeable officials under oath, its investigation may become a nullity</u>.

> [<u>Ibid.</u> (emphasis added) (citations omitted).]

For investigations to be conducted by either the executive or legislative branches of municipal government, these entities must have subpoena power. <u>Id.</u> at 532.

Thus, implicit in the Legislature's creation of investigatory authority through policy and N.J.S.A. 40A:14-118 is the creation of the subpoena power. <u>Ibid.</u> As for the delegation of subpoena power to the CCRB, N.J.S.A. 40A:14-118 expressly anticipates such delegation. It anticipates a municipal governing body's creation of "committees" or "commissions" to perform investigations, and/or the executive's appointment of an administrative officer to perform investigations. <u>Cf.</u> <u>Jansco v. Waldron</u>, 70 N.J. 320, 326-27 (1976) (stating that

---

> (a) Require any municipal officer, in its discretion, to prepare and submit sworn statements regarding his official duties in the performance thereof, and otherwise to investigate the conduct of any department, office or agency of the municipal government;

> (b) Remove, by at least two-thirds vote of the whole number of the council, any municipal officer, other than the mayor or a member of council, for cause, upon notice and an opportunity to be heard.

the pre-1981 version of N.J.S.A. 40A:14-118 anticipated sub-delegation of power to adopt disciplinary rules and regulations for police departments). Where such delegation occurs within the legislative branch, State law expressly anticipates the delegation of subpoena power. Specifically, N.J.S.A. 40:48-25 states:

> When the governing body of a municipality shall have appointed a committee of its members upon any subject or matter within its jurisdiction, the committee may issue a subpoena ad testificandum, or subpoena duces tecum, to any person within this state, to appear before it to give testimony or information required.
>
> [(Emphasis added).]

Thus, in Shain, 92 N.J. at 530-39, the Court held that a municipal council in a Faulkner Act municipality, like here, had the authority to delegate its subpoena power to a special investigatory committee that consisted entirely of council members. In so holding, the Court noted the power of legislatures to perform investigations, id. at 530-34, and stated that "[n]o specific statutory grant is necessary to vest a legislative body with subpoena power," because "[t]he power to compel testimony is inherent in the legislative power to investigate." Id. at 532.

Moreover, the New Jersey State Constitution Article IV, § VII, ¶ 11, and the necessary and proper clause of N.J.S.A. 40:48-2, provide further support for

67

our conclusion that the CCRB enjoys subpoena power as it fulfills its function under the Ordinance. The New Jersey Supreme Court has "consistently held [N.J.S.A. 40:48-2] is itself a reservoir of police power." Inganamort, 62 N.J. at 536.

> [N.J.S.A. 40:48-2 is] an express grant of general police powers to municipalities [and] has been made impregnable by the continued legislative acquiescence therein, by the mandate of Article IV, Section VII, paragraph 11 of the Constitution of 1947 that acts concerning municipalities be liberally construed, and by the adherence thereto of the more recent judicial decisions . . . .
>
> Plainly, therefore, [N.J.S.A. 40:48-2] must be considered as an express grant of broad general police powers to municipalities.
>
> [Ibid. (citations omitted).]

Relying on its express and implied powers, the City is authorized to delegate to the CCRB authority to issue subpoenas in accordance with the terms outlined in the Ordinance.[17]

---

[17] Under federal law, the United States Supreme Court has held that the parallel "Necessary and Proper Clause" of U.S. Const. art. I, § 8 permits Congress to delegate subpoena power. See Oklahoma Press Publ'g Co. v. Walling, 327 U.S. 186, 214 (1946), which incidentally was decided two decades after McGrain, the case that our Court relied on in Shain.

Finally, FOP's reliance on City of Newark v. Benjamin, 144 N.J. Super. 58 (Ch. Div. 1976), is misplaced. Benjamin pertains to an attempt to create a CCRB by voter initiative with elected members, which essentially created another elected body, in violation of the Faulkner Act. Id. at 63. Here, the City established the CCRB by Ordinance with appointed members, not voter initiative. Indeed, the Benjamin court drew that distinction by stating, "what is involved here is not whether the Newark council had the power to enact an ordinance for civilian review of police conduct, but whether it can be done by initiative in a Faulkner Act city." Id. at 68.

In Benjamin, the court recognized that "the subpoena power of a municipal investigative body is set forth in N.J.S.A. 40:48-25." Id. at 72. The court did not consider whether municipal executive and legislative bodies were authorized to issue subpoenas, or delegate the authority to issue subpoenas, under N.J.S.A. 40A:14-118 because the relevant language of N.J.S.A. 40A:14-118 was not adopted until after Benjamin was decided. Here, the City seized its power and acted decisively by creating the CCRB.

In summary, the CCRB's findings are not binding and the identity of complainants and police officers must remain confidential. The Ordinance is valid on its face and cannot alter the NPD's obligation to follow the AG

Guidelines when undertaking its own IA investigations. Consequently, the CCRB can function as intended under the Ordinance, including providing an oversight role by investigating alleged police misconduct, conducting hearings, participating in the development of a disciplinary matrix, making recommendations, and issuing subpoenas. Consistent with this opinion, as applied challenges may be made if warranted.

Affirmed in part; reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION